[Civ. No. 29811. Second Dist., Div. Five. June 28, 1967.]

In re LAURIE LYNN WORMS, a Minor, etc., et al., for Change of Name. LAURIE LYNN WORMS, a Minor, etc., et al., Petitioners and Respondents, v. BERNARD ALBERT WORMS, Objector and Appellant.

Samuel W. Blum for Objector and Appellant.

Shacknove & Goldman, Ben F. Goldman, Jr., and Philip J. Shacknove for Petitioner and Respondents.

KAUS, P. J.—This appeal involves a question of first impression in this state: what are the legitimate criteria for the exercise of the trial court's discretion, when a mother, divorced from the father of her children and since remarried, petitions to have the surname of the children changed to that of her second husband and the natural father objects?

Laurie Lynn Worms, born December 21, 1953, and Curtis Jeffrey Worms, born December 26, 1952, on petition filed as prescribed by section 1276 of the Code of Civil Procedure were permitted to change their last name to that of their stepfather, Melvin Freilich, a medical doctor. Bernard A. Worms, their natural father, who had been divorced by the mother of the minors about eight months after the younger of the two children was born, objected strenuously but to no avail. The only relevant grounds[1] for the change of name alleged in the petition are:

1. That the children encountered difficulties in school with other students over the name ''Worms,'' which name had led

---

[1]We consider it irrelevant that, as alleged in the petition, a daughter born to Doctor Freilich and the mother of the minors allegedly suffered humiliation and mistreatment from other youngsters when in the company of her stepbrother and stepsister. In any event no evidence was offered to support this allegation.

to violent conduct on the part of other children and "many unhappy and unpleasant experiences."

2. That Mr. Worms had not contributed to the support of his children for about eighteen months and even before then had never been punctual in making his support payments.

Mr. Worms filed objections to the petition, alleging, in effect, that it was just another step in Mrs. Freilich's campaign to alienate the children from him. He also presented reasons for his delinquency in making support payments and asserted his pride in his family name.

The petition came on for hearing. The only witnesses were the Freilichs and Mr. Worms. There is no direct evidence in the record that the children themselves desired the change of name, but there is proof of a very sad absence of affection by the children toward Mr. Worms, particularly on the part of the boy. It is not claimed that this alienation was wanted by Mr. Worms, although it is obvious that he may not always have been very wise in his attempts to prevent it.

The petition came on for hearing together with an order to show cause in re contempt in connection with a large number of support payments which Mr. Worms had failed to make.[2] At the conclusion of the hearing he was found guilty on one count of contempt. After some rather weak testimony[3] that in the past the children had suffered embarrassment because of the name "Worms" the court permitted the change of names as prayed.

The record also contains a good deal of evidence concerning the relationship over the years between Mr. Worms, his children and Dr. and Mrs. Freilich. There is no need to detail the testimony. Those with any experience in these matters know what it is: failure to notify the mother when Mr. Worms would be late or unable to pick up the children, delivery of the children unsuitably dressed for whatever activities Mr. Worms had in mind, friction concerning the choice of doctors

[2]The reporter's transcript indicates that the court also had a motion with respect to visitation problems before it.

[3]We assume in support of the decre that the trial court accepted this testimony without reservations. Even so, all it amounted to was testimony concerning a fight when Curtis started kindergarten, teasing when new children moved into the community, "picking on" by one particular teacher from whose class Curtis had been removed and emotional disturbances when things of that nature happened. It is noted that this testimony apparently goes back to a point of time a half dozen years before the hearing and that, of course, these children are now entering their mid-teens when a more adult atitude on the part of their peers should remove the minimum embarrassment which the name had caused in the past.

and dentists, harsh words between the stepfather and Mr. Worms and an alleged assault on Mrs. Freilich. Finally there is, of course, a rather prolonged period of nonpayment of support. This was explained by Mr. Worms as the result of financial reverses. Although it may well have appeared to the trial court that Mr. Worms gave too high a priority to the repayment of his commercial obligations and although the court was perhaps charitable in finding him guilty of contempt on just one failure to make his periodic payments, the evidence falls far short of that which would be necessary to support a finding that Mr. Worms had, in effect, committed such misconduct as would have justified a forfeiture of his parental rights. (See *Guardianship of Case*, 57 Cal.App.2d 844, 848 [135 P.2d 681].)

At the conclusion of the hearing the court announced that Mr. Worms was "unable to see what that name [Worms] means in an American playground context." The court then gave two examples of foreign names—one Eastern European, the other Oriental—which, it said, were distinguished names in their respective countries but which it was cruel and horrible to force children to use in America, because each name contained a four-letter syllable which, colloquially, denotes excrement: *"The name Worms has scatological overtones, if I have to be so frank with you, in this country and, if you don't know it, it means that you sincerely are still a European."*

After a few more remarks along the same lines the court, without adverting to any other factor pertinent to its ruling, gave Mr. Worms an opportunity to consent that the children could use the name Freilich in school. When no such consent came forth, the decree appealed from was signed and entered.

"Scatological" is defined in all dictionaries as "relating to excrement" or "marked by an interest in excrement or obscenity." Although there are perhaps prettier names than "Worms," it seems obvious that it is not scatological and that it does not have such overtones.

There may be names so repulsive, obscene and embarrassing that a court can consider the very name itself as a significant factor on a petition such as this one, but "Worms" is not such a name.

The balancing of legitimate competing interests in a case such as this is a ticklish enough process. By throwing the inelegance of the father's name into the scales—indeed, to the exclusion of all other relevant factors—the trial court failed

to give the father's objections to the petition the consideration which they deserved. (Cf. *People* v. *Robarge*, 41 Cal.2d 628, 634 [262 P.2d 14].)

█ Our function, however, is not merely negative. We should indicate by what standard the court must be guided at a retrial (Code Civ. Proc., § 53) if Mr. Worms and Mrs. Freilich are unable to adjust the problem amicably.

As we said at the outset, there is no California law precisely in point. After the hearing in the case at bar, *Montandon* v. *Montandon*, 242 Cal.App.2d 886 [52 Cal.Rptr. 43] was decided. That case did not involve a formal petition under section 1276 of the Code of Civil Procedure, but was a proceeding by the divorced father to have the court order the mother to discontinue the use of the surname of her second husband for the children. Although the case contains much language concerning the natural and traditional right of a father that his children bear his name, it is factually distinguishable from ours. The court points out that there was no evidence of any confusion, embarrassment or emotional disturbance. As we have noted there is some such evidence in our case. It is also noted that at no time had Mr. Montandon been declared in default of his obligation to make support payments.

On the other hand, since *Montandon* merely involved a reversal of the trial court's refusal to order the mother to have the children use the father's surname, it is in no sense a holding that if there is evidence of confusion, embarrassment and defaults in support payments, the exercise of the trial court's discretion in favor of the change of name would not have been disturbed. In any event—as we have already noted—it appears from the record in the case at bar that the trial court gave little, if any, weight to these matters.

Neither the trial court,[4] nor this court, was advised by the parties that actually there is quite a substantial body of law in other jurisdictions which deals with the problem. The cases are collected in the following references: Note 53 A.L.R.2d 914: "Rights and remedies of parents inter se with respect to the names of their children;" 65 Corpus Juris Secundum "Names," page 26, footnote 33.5 and pages 29-30 footnotes 54.20 through footnote 57; 44 Cornell Law Quarterly, page 144.

█ In 53 A.L.R.2d 914, 915 the annotator sums up the law as follows: "The courts have generally recognized that

[4]The oral arguments below are not in the record here.

the father, who is ordinarily the objecting party, has a protectible interest in having his child bear the parental surname in accordance with the usual custom, even though the mother may have been awarded custody of the child. So, a change of name will not be authorized against the father's objection, merely to save the mother and child minor inconvenience or embarrassment. However, where the child's substantial interests require a change of name, as where the father's misconduct has been such as to justify a forfeiture of his rights or where his name is positively deleterious to the child, the change may be permitted."

Our examination of the cases persuades us that this is a correct statement of the law. Obviously the test thus enunciated leaves a good deal to the discretion of the trial court, even on admitted facts. The following observations, however, seem appropriate:

 1. In determining whether or not the child's substantial interests require a change of name, a somewhat different criterion should be applied than in custody matters. There, it has been said ". . . all other rules must yield to the fundamental one that the court should always adopt the course that is for the best interests of the child." (*Bemis* v. *Bemis,* 89 Cal.App.2d 80, 90 [200 P.2d 84].) Here the advantage to the child in having the name changed must be so "substantial" as to outweigh the natural right of the father that his children bear his name. The weight to be given to the father's natural right will of course vary from case to case. The father who has always shown an abiding love for his children obviously is in a better position to urge his desires, than the one who has neglected the relationship and who merely uses his standing before the court as a weapon in a post-marital skirmish.

2. Our study of the practical application of the general principles at the trial level in other jurisdictions, particularly New York, demonstrates that the trial courts generally demand a strong showing before they will grant the petition. This is perhaps just an observation concerning the behavior of trial courts, rather than a rule which can be successfully applied on appeal. Yet in *Application of Zipper,* 2 App.Div. 2d 756 [153 N.Y.S.2d 282], an appellate court, on facts fairly similar to the case at bar, reversed the granting of the petition without even allowing a rehearing below, observing: "To deprive a son of his father's surname is a serious and far-reaching action." (*Ibid.,* p. 283.)

We need not decide whether the evidence below would have supported the decree had it been properly considered. Further, it may well be that if this matter is heard again the then circumstances will warrant the granting of the petition. Today, however, we reverse, because of the trial court's erroneous and apparently exclusive reliance on the coarseness of the petitioners' family name.

The judgment (decree) is reversed.

Stephens, J., and Frampton, J. pro tem.,* concurred.

A petition for a rehearing was denied July 25, 1967, and respondents' petition for a hearing by the Supreme Court was denied September 21, 1967.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.