Herbert A. Posner, J.
"What’s in a name? That which we call a rose, by any other name would smell as sweet.” (Romeo and Juliet, act II, scene 2.) While Romeo would have gladly shed his name (for love of Juliet), this application for change of name was bitterly resisted.
Steven Krcelic was born on July 23, 1972 to Stephan and Katerina Krcelic. Two years later the father and mother were divorced (July 22, 1974) and custody of the infant was granted to the mother. The mother reassumed her maiden name, Ivanko, and registered Steven in a private nursery school under that name. She now petitions the court to permit her four-year-old son to assume the matriarchal name.
Most change of name petitions are unopposed, but this one was the subject of four days of hearings commencing February 25 and culminating on March 29, 1977, with armed court officers present at all of the hearings. Since the father was not given visitation rights in the July 22, 1974 divorce decree, granting a change of name would, in effect, result in the final and complete termination of Stephan Krcelic’s paternal ties to Steven Krcelic.
Normally, the physical fact of having begotten a child has far-reaching psychological meaning for the father as confirmation of his sexual identity, his potency and intactness. Derived from this is the inclusion of the child in the parent’s self-love. *667 A biological parent is credited with an invariable, instinctively based positive tie to the child, although this is frequently belied by evidence to the contrary in cases of infant battering, child neglect, abuse and abandonment. By contrast, for the child, the physical realities of his conception and birth are not the direct cause of his emotional attachment. This attachment results from day-to-day attention to his comfort, affection and stimulation. Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his "psychological parent” as well as his biological one. An absent biological parent will remain, or tend to become, a stranger. (Goldstein, Freud & Solnit, Beyond the Best Interests of the Child, ch 2, pp 16-17.)
The petitioner, Katerina Ivanko, in a seven-page affidavit, has attempted to convince the court that her former husband, from the very day the child was born, has belied the normal concept postulated in the preceding paragraph. She made the following material statements of fact in her affidavit (and reaffirmed them on the witness stand):
(1) The father refused to make any payment for either the hospital or birth expenses, nor has he ever done so.
(2) Approximately one month and a half after the child was born, the father came home at 1:00 a.m. in a drunken condition, and after threatening both the petitioner and the infant, put them both out of the apartment.
(3) Both petitioner and the child left the apartment to live elsewhere and have never lived with the father again.
(4) Absolutely no contribution was made by the infant’s father toward the maintenance and support of the child, nor has the father ever made a contribution of even a single penny since the child was born.
(5) The infant has not seen his father since he was one and one-half months of age, and the father has made no attempt to see the child during this long period of time.
(6) In early 1974, petitioner instituted an action against the infant’s father for divorce. The divorce was granted to the petitioner without any visitation rights to the father, but with an award of $25 weekly support for the child, which the father has never paid.
(7) Five days before the divorce decree was granted, the child’s father assaulted petitioner with a knife, inflicting severe lacerations upon her breast, neck, throat and hands, *668 requiring 35 sutures and resulting in permanent disfiguring scars.
(8) The infant’s father was arrested and convicted of assault in the first degree. He was sentenced to a seven-year term in Attica State Prison, and after serving approximately one and one-half years, was released on probation in August, 1976 under the supervision of the Parole Board.
(9) The infant has been using and has only been known by the name Steven Ivanko, from September, 1972 to the present.
(10) The best interest of the infant would be served if he was granted leave to assume his mother’s maiden surname, because of the shame and embarrassment brought on by the father’s reputation for drunkenness, threats, violence, physical assault upon the petitioner and his confinement in State prison.
When the father took the witness stand to refute the petition, he told the court that the petitioner’s affidavit was "all lies”. When the court pressed him for specificity, he contradicted a number of material facts alleged by the petitioner. He said that:
(1) He did pay for the child’s birth.
(2) That he never struck the child.
(3) That he never threw the child and his mother out of the apartment.
(4) That the three of them lived together with him until January, 1974, when his wife voluntarily left him and took the child without his knowledge and consent.
(5) That he had supported the child from his birth until January, 1974, including paying for a trip to Yugoslavia which the mother and child made in the summer of 1973.
In addition to the above, he contended that the assault upon his wife was because she had sent the child to Yugoslavia in July, 1974, without his permission. She contradicted all of his contentions and told the court that the first time the child went to Yugoslavia was in 1975, when, on vacation, she took the boy to see his grandmother. Faced with these diametrically opposed stories, the court adjourned the hearing for one week to permit both parties to bring in proof of their contentions. The next hearing opened the door to new "bones of contention” and a fourth (and a final) hearing was held the week after.
*669 The truth is like a kernel of corn that lies hidden beneath the husk. The mother’s appearance on the witness stand and the convincing manner in which she told her story was like an ear of corn with a clean, emerald-green husk. The father’s appearance on the witness stand and the manner in which he told his story was like an ear of corn whose husk had rotted in the field. However, the kernels underneath the father’s husk were pearl-white and the ones underneath the mother’s were not. From the evidence presented by both parties the court is convinced that the father’s version of the story is the true one. The portion of the mother’s story that is true begins with the July 17, 1974, assault by the father and the subsequent events.
Traditionally, the courts have held that the father of the child has a natural right to have his child bear his name unless the child’s best interests are adversely affected. In the past, such name changes have been granted over the father’s objections only where the father has committed a heinous or notorious crime that might stigmatize the child. (Matter of Fein, 51 Misc 2d 1012; Matter of Yessner, 61 Misc 2d 174.) The recent trend, however, has been more liberal. In a landmark decision on this question, made by Judge Zelman of this court, the court permitted the child to assume the stepfather’s name where the natural father had not seen or supported his child since his divorce from the child’s mother (Matter of Williams, 86 Misc 2d 87).
This court distinguishes this case from flatter of Williams for the following reasons: (1) This case does not involve a stepfather who has become the psychological father to the child; (2) the natural father was unable, through incarceration, to either see or support his child; (3) the mother’s falsification of many material facts in her petition forces this court to apply the principle of "falsus in uno” (Deering v Metcalf, 74 NY 501; Cibulski v Hutton, 47 App Div 107).
Normally, for the reasons enumerated in (3) above, the petitioner’s petition would be dismissed with prejudice. However, the cardinal principle is the "best interests of the child”. Therefore, this court is dismissing the petition without prejudice. If the father fails to support the child and/or fails to obtain any visitation rights in the coming months, the petitioner may have a valid right to bring on a new application in the future. This court would be pleased to consider such *670 petition, with one admonition to the petitioner, "the truth, the whole truth and nothing but the truth.”