D. R. S., Appellant (Plaintiff Below),

v.

R. S. H., Appellee (Defendant Below).

No. 2-979A272.

Court of Appeals of Indiana,
Second District.

Dec. 2, 1980.

Michael T. Conway, Indianapolis, for appellant.

Charles V. Traylor, Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Plaintiff D.R.S. appeals from a judgment in an action on a Voluntary Petition to Establish Paternity of Child and Provide for Its Support requiring her child to bear the surname of his biological father, claiming that the order was contrary to law, unsupported by the evidence, and an abuse of discretion.

We affirm.

## FACTS

D.R.S. is the unwed mother of a one-year-old child, J. Ten days after J.'s birth, D.R.S. and the biological father, R.S.H., jointly filed a Voluntary Petition to Establish Paternity.

At the hearing, the parties stipulated that R.S.H. was the child's father and that he would pay child support of twenty-five dollars per week. The parties asked the court to allocate medical expenses associated with the child's birth, to establish visitation rights for the non-custodial father, and to determine whether J. should retain his mother's maiden name or take the surname of his father.

After the trial judge indicated that he would be inclined to reduce support payments if the name were not changed, D.R.S. testified that she would forego all support if J. retained her surname. She maintained that because she has no plans to marry and

would retain her maiden name even if she were to marry, there would be no potential for confusing J. She also testified that J.'s retention of her name would promote consistency because J. would be living with her.

R.S.H. testified that he had paid some support since J.'s birth and that he would be willing to pay one-half of the medical expenses already incurred along with one-half of all future medical bills not covered by insurance.[1] He stated that he wished to have J. bear his surname.

The court ordered that R.S.H. pay twenty-five dollars per week as support, that he have visitation rights, that the parties split the costs of the action and medical expenses, and that J. subsequently be known by his father's surname.

## ISSUE

D.R.S. raises one issue:

Was the court's order changing the child's surname contrary to law, against the evidence, or an abuse of discretion?

## DECISION

*PARTIES' CONTENTIONS*-D.R.S. contends that the court's action was erroneous because the law provides that an illegitimate child is to carry the mother's name, and there was no evidence to support a change of name. Hence, she maintains that the court abused its discretion in ordering the change. R.S.H. responds that the law vests the court in a paternity action with the power to effect such a change.

*CONCLUSION*-The court's action in changing the child's name was neither contrary to law, against the evidence, nor an abuse of discretion.

D.R.S. leans heavily on certain Indiana statutes as preventing the trial judge from requiring J. to bear the name of his father. There is no Indiana case law on this precise point.

---

1. D.R.S. presently has health insurance covering J.

Her main reliance is on Ind.Code § 31–4–1–8,[2] which deals with the court's powers in a paternity proceeding. That section of the law simply authorizes the parents of a child born out of wedlock to file a voluntary joint petition requesting that the court establish the child's paternity and make provision for its support. The court, after conducting a hearing, is to "make a finding and enter judgment and make an order in accordance therewith." *Id.* Ind.Code § 31–4–1–19,[3] covering the order in a paternity action, provides that "[i]f the verdict or finding be against the defendant, the court shall enter a judgment against him, and make an order which shall make adequate provision for the support of the child, taking into consideration the needs of the child and the ability of the defendant to pay." D.R.S. argues that because the law on paternity actions is silent with respect to judicial discretion in general and name changes in particular, the legislature did not intend to authorize changing the child's name in paternity proceedings. In short, she interprets these sections as an exclusive statement of the court's powers in a paternity action, namely, to determine the issues of paternity and support.

D.R.S. construes other Indiana statutes as not permitting name changes in paternity actions. Ind.Code § 16–1–16–15 (1976), covering vital statistics, specifies that "[a] child born illegitimate shall be *recorded* under the name of the mother" (emphasis supplied). Other sections of the law authorize a change of surname and birth record for an illegitimate child following its parents' marriage.[4] These statutes, she says, taken together, amount to a legislative directive that an illegitimate child may assume the paternal surname *only* if its parents marry.

We decline to give the statutes the restrictive interpretation which D.R.S. proposes.[5] It is true that neither Ind.Code § 31–4–1–8, which creates and prescribes the mode of proceeding in a paternity action, nor Ind.Code § 31–4–1–19, which describes the order to be entered in such an action, authorizes a change in the child's

---

**2.** This section was in force at the time of the hearing but was repealed by Acts 1978, P.L. 136, § 57, effective October 1, 1979. Ind.Code §§ 31–6–6.1–1 to –19 (Supp.1980) contains the new law on paternity. The subject matter of former § 31–4–1–8 is covered by Ind.Code § 31–6–6.1–2(a)(3) (Supp.1980), which specifies that the mother and biological father of an illegitimate child may join in filing a paternity action, and by Ind.Code § 31–6–6.1–10 (Supp. 1980), which provides for a judicial hearing in a paternity action to determine the issues of support, custody, and visitation.

**3.** This section, also in effect at the time of the hearing in this case, was repealed by Acts 1978, P.L. 136, § 57, effective October 1, 1979. For the new law on paternity, see Ind.Code §§ 31–6–6.1–1 to –19 (Supp.1980).

**4.** D.R.S. points to Ind.Code § 31–6–6–22. This section was to have taken effect on October 1, 1979, but was repealed by Acts 1979, P.L. 277, § 4, effective October 1, 1979. Other statutory provisions, however, permit a change of name and birth certificate after the parents of an illegitimate child marry. *See* Ind.Code § 31–4–2–1, repealed by Acts 1978, P.L. 136, § 57, effective October 1, 1979, but in force at the time of the hearing. *See also* Ind.Code §§ 16–1–16–16 and –17 (1976), authorizing issuance of a new birth certificate and destruction of the original certificate after the parents of an illegitimate child marry, and Ind.Code §§ 16–4–

1–1 and –2 (1976), permitting a change of name and birth record of an illegitimate child on proof of its parents' marriage.

**5.** In support of his contention that the judge in a paternity hearing has the power to order a change of surname, R.S.H. directs our attention to Ind.Code § 31–4–1–28. Repealed by Acts 1978, P.L. 136, § 57, effective October 1, 1979. That section, which was in effect at the time of the hearing, provides in relevant part:

Whenever a final order or judgment has been entered, establishing the paternity of any child, the clerk shall immediately prepare a certified statement containing all information required by the State Board of Health, including, but not limited to, the following facts: *the name of the child*, the date of the birth of the child, the birthplace of the mother, the name and birthplace of the father. *Id.* (emphasis supplied.) R.S.H. would have us interpret this provision as authorizing the judge to certify a statement which alters the child's surname. We decline to construe this statute so expansively. The statute requires that "facts" be listed; factually, the name of the child is the name with which he is born. The information which the statute contemplates deals with "vital statistics." *Cf. Carpenter v. Goodall* (1969), 144 Ind.App. 134, 244 N.E.2d 673.

name. It is equally true, however, that neither provision proscribes changing the child's name in the context of a paternity proceeding. Those sections of the law which authorize a change of name and birth record after the parents of an illegitimate child marry do not purport to make marriage a condition precedent to changing the name or to provide the exclusive method for appending the unwed father's surname to the child. The use of the word "recorded" in Ind.Code § 16–1–16–15 (1976), which requires that an illegitimate child be recorded under its mother's name, refers only to the filing of a birth certificate with the local health officers: While this statute may be viewed as supporting the position that an illegitimate child traditionally takes its mother's name *at birth*, it does not implicitly or explicitly prohibit a subsequent judicial determination that the child's surname should be changed to that of its father. It seems to be designed to reach those situations in which only the mother is involved.

Having determined that no Indiana statute expressly forbids ordering a name change in a paternity proceeding, we turn to a discussion of the nature and purposes of the action to establish paternity in Indiana.

At common law, an illegitimate child was *filius nullius*, the son of no one, or *filius populi*, the son of the people. *Truelove v. Truelove* (1909), 172 Ind. 441, 86 N.E. 1018, 88 N.E. 516; *Jackson v. Hocke* (1908), 171 Ind. 371, 84 N.E. 830. *See also* 10 Am. Jur.2d *Bastards* § 8 (1963). The child had no legally recognized father or mother and, therefore, no legal rights. Apparently, custom did not dictate the name by which an illegitimate child would be known; the child bore the name gained by reputation in the community. *People v. Gray* (1911), 251 Ill. 431, 96 N.E. 268.

Today, the rights of illegitimate children are prescribed by statutes which mitigate the harshness of the common law. In Indiana, for instance, a child born out of wedlock is automatically treated as the legiti-mate child of its mother for purposes of inheritance; the child is treated as the legitimate child of its father with reference to the laws of inheritance if the child's paternity has been established by law during the father's lifetime or if the putative father marries the mother and acknowledges the child as his own. Ind.Code § 29–1–2–7 (1976).

In creating the action to establish paternity of an illegitimate child and compel the father to contribute to its support, the legislature again sought to soften the rigors of the common law. The primary purpose of a paternity action, according to our supreme court, is to secure the support and education of the illegitimate child. *Nott v. Bender* (1964), 246 Ind. 186, 202 N.E.2d 745; *State ex rel. Beaven v. Marion Juvenile Court* (1962), 243 Ind. 209, 184 N.E.2d 20. A subsidiary goal of the action is to protect the public interest by preventing the illegitimate child from becoming a ward of the state. *J.E.G. v. C.J.E.* (1977), Ind.App., 360 N.E.2d 1030. *See generally* 10 Am.Jur.2d *Bastards* § 75 (1963). In *Opp v. Davis* (1961), 133 Ind.App. 365, 179 N.E.2d 298, 180 N.E.2d 788, we observed that the statute was designed for the "protection and welfare of guiltless children." *Id.* at 370, 179 N.E.2d at 300. And in *Sullivan v. O'Sullivan* (1959), 130 Ind.App. 142, 162 N.E.2d 315, we recognized the underlying purpose of the statute to be

> to provide proper legal procedures to enable such children to have the proper care, maintenance, education, protection, support and opportunities, the same as children born in wedlock, and to establish the necessary legal procedure to enforce such rights and privileges for such children.... Thus, it is apparent that any action brought under the "children born out of wedlock" act is solely for the benefit of such children.

*Id.* at 146, 162 N.E.2d at 317.

In some states, the principal purpose of a paternity action is to impose criminal liability on the unwed father.[6] In Indiana,

---

**6.** Even in states in which paternity actions are criminal in nature, the penalty ordinarily is to compel the father to support his child rather than to punish him for misconduct. *See generally* 10 Am.Jur.2d *Bastards* § 75 (1963).

however, the action is designed to assure the support of the illegitimate child rather than to vindicate public justice. Proceedings to establish paternity are civil in nature and are governed by the rules of procedure applicable to civil actions. *O. Q. v. L. R.* (1975), 164 Ind.App. 227, 328 N.E.2d 233; *In re Atterbury* (1973), 155 Ind.App. 566, 293 N.E.2d 522.

■ In view of the civil nature and protective purpose of the action to establish paternity in Indiana, it is reasonable to conclude that the legislative intent has not been to penalize the unwed father. The fact that the statute authorizes the putative father and mother to join in initiating an action in which the father may establish his natural parentage and voluntarily assume his parental duties militates against the notion that the statute's purpose is punitive.[7] Furthermore, the statute reflects increased judicial[8] and legislative[9] acknowledgement of the rights of unwed fathers.

Bearing in mind the emerging protection of the unmarried father's parental rights,[10] as well as the underlying purpose of the action to establish paternity, namely, to advance the child's best interests, we turn to a discussion of the law regarding name changes.

■ At common law and today, in the absence of a statute to the contrary, an individual may change his name at will so long as the change is not effected for a fraudulent purpose. *Petition of Hauptly* (1974), 262 Ind. 150, 312 N.E.2d 857; 57 Am.Jur.2d *Name* § 10 (1963); Annot., 110 A.L.R. 219 (1937). Ind.Code § 34–4–6–1 (1976) provides a procedure by which a name change may be accomplished by court decree. The statute does not repeal the common law rule; it merely furnishes an additional method of effecting a name change. *See Petition of Hauptly, supra*; 57 Am.Jur.2d *Name* § 11 (1963); Annot., 110 A.L.R. 219 (1937). In *Petition of Hauptly, supra*, our supreme court set forth the responsibility of a court hearing a petition for a change of name:

The only duty of the trial court upon the filing of such a petition is to determine

---

7. Some states do not provide procedures for the commencement of a paternity action by the unwed father. *See, e. g., Slawek v. Stroh* (1974), 62 Wis.2d 295, 215 N.W.2d 9. The Wisconsin statute at issue in *Slawek* contemplated that a paternity action would be initiated by the mother's complaint or by the district attorney. Nevertheless, the court indicated that the putative father had a constitutional right to bring a declaratory judgment action to establish parentage and to determine his paternal rights and duties. Recent decisions recognizing the rights of unmarried fathers–in particular the U. S. Supreme Court's decision in *Stanley v. Illinois, infra* note 8–influenced the Wisconsin court.

8. *E. g., Stanley v. Illinois* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. *Stanley* involved an Illinois statute which denied an unwed father a hearing on his parental qualifications before his children were removed from his custody, but granted such a hearing to all other parents whose custody was challenged. The U. S. Supreme Court concluded that the scheme contravened both the due process and equal protection clauses of the fourteenth amendment. *Id.* at 649–58, 92 S.Ct. at 1211–1216.

*See also Caban v. Mohammed* (1979), 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297, in which a majority of the Supreme Court held unconstitutional under the equal protection clause a New York law which gave an unwed mother, but not an unwed father, the power to veto an adoption of their child simply by withholding consent. *Id.* at 388–395, 99 S.Ct. at 1766–69.

9. *E. g.,* Ind.Code § 31–3–1–6(a)(2) (Supp.1980), which requires written consent to adoption not only by the unwed mother but also by "the father of such child whose paternity has been established by a court proceeding"; and Ind. Code § 31–3–1–6.1 (Supp.1980), which authorizes the court to "conduct a hearing on any objection which the putative father has to the adoption of the child" if the father fails or refuses to consent to the adoption.

10. In the area of name changes, the court in *Eschrich v. Williamson* (Tex.Civ.App.1972), 475 S.W.2d 380, ruled that under the United States and Texas Constitutions the natural father was entitled to notice of a proceeding to change the name of his minor child. *Id.* at 382. Although *Eschrich* involved a divorced father, the decision arguably encompasses unwed fathers as well. *See generally* Annot., 92 A.L.R.3d 1091, 1097 (1979).

that there is no fraudulent intent involved. Once having so found, we hold that it is an abuse of judicial discretion to deny any application for a change of name under the statute.

262 Ind. at 153, 312 N.E.2d at 860.

■ Although Indiana law covers name changes in general, no Indiana court has previously considered the question of whether a child's name should be changed over the objection of one of the parents. The problem has arisen in other jurisdictions, however, usually in the context of a mother's petition to change her child's surname from that of her former spouse (the child's biological father) to that of her present spouse. In several cases, the divorced mother has sought leave to change her child's name to her maiden name, e. g., *Application of Krcelic* (Civ.Ct.N.Y.1977), 90 Misc.2d 666, 395 N.Y.S.2d 382; *Application of Yessner* (Civ.Ct.N.Y.1969), 61 Misc.2d 174, 304 N.Y.S.2d 901; *Application of Fein* (Civ.Ct.N.Y.1966), 51 Misc.2d 1012, 274 N.Y. S.2d 547; *Petition of Harris* (1977), W.Va., 236 S.E.2d 426, or to append her maiden name to the children's paternal surname, *Laks v. Laks* (Ct.App.1975), 25 Ariz.App. 58, 540 P.2d 1277. Courts have reached conflicting results. Nevertheless, all agree that the welfare of the child is the paramount consideration in deciding whether a child's name should be changed over the opposition of one parent. *E. g., Lazow v. Lazow* (Fla.Dist.Ct.App.1962), 147 So.2d 12; *Mark v. Kahn* (1956), 333 Mass. 517, 131 N.E.2d 758; *Robinson v. Hansel* (1974), 302 Minn. 34, 223 N.W.2d 138; *Application of Baldini* (Civ.Ct.N.Y.1959), 17 Misc.2d 195, 183 N.Y.S.2d 416; *In re Russek* (Ct.App. 1974), 38 Ohio App.2d 45, 312 N.E.2d 536; *Petition of Harris, supra.* See generally 57 Am.Jur.2d *Name* § 14 (1963). In determining whether a change of name will promote the child's best interests, courts look to various factors.

■ First, significant consideration is given to the father's interest in having his child bear the paternal surname in accordance with tradition. *E. g., Laks v. Laks, supra; In re Worms* (Ct.App.1967), 252 Cal.

App.2d 130, 60 Cal.Rptr. 88; *Lazow v. Lazow, supra; Robinson v. Hansel, supra; Petition of Harris, supra.* See generally Annot., 92 A.L.R.3d 1091, 1105–06 (1979). In *Petition of Harris, supra,* the West Virginia Supreme Court listed various practical considerations in support of the custom:

> For example, a surname common to both parent and child makes it easier to demonstrate a legal relationship for the purpose of qualifying for benefits with the Social Security Administration upon the death of the father, as an heir in the event of intestate succession, or as the beneficiary of certain types of group insurance policies such as "G.I. Insurance" where the beneficiaries are established by law unless specifically changed by the insured.
>
> In addition, in areas where families live in a given county for successive generations, a family name may be a substantial financial asset. A well–regarded and trusted member of a community may pass on to his children a certain presumption with regard to honor, integrity and fair dealing based upon the conduct of the parents. Regardless of the relationship between the parents, this can be a valuable asset to the children. It may give the children a substantial edge in life when they seek credit, employment, or admission to tightly controlled union, trade, or professional groups. *Of course, all of these benefits ·could theoretically pass through the female line as well as the male line, but it is not customary. People expect children to bear the surname of their fathers, and as the circuit judge in one of the cases before us so ably pointed out, a child's bearing a woman's maiden name does give fair indication that the child is illegitimate. This may not be the way things ought to be; however, at this stage of our development, it is the way things are.*

236 S.E.2d at 429 (emphasis supplied).

Although the case involved a divorced mother's petition to change her son's name to her maiden name, many of the factors enumerated by the court in *Petition of Har-*

*ris* apply with equal force to the offspring of divorced and unmarried parents, particularly in view of the increasing legislative and judicial recognition of the rights of illegitimate children.

Upholding the tradition of having a child bear the paternal surname promotes the child's welfare not only in a pragmatic way but also in a more subtle, but equally important, fashion: retention of the paternal surname strengthens the father–child relationship. *Laks v. Laks, supra; Lazow v. Lazow, supra; Robinson v. Hansel, supra; In re Russek, supra.* In *Robinson v. Hansel, supra,* the court explained that

> [s]ociety has a strong interest in the preservation of the parental relationship. Even though a divorce decree may terminate a marriage, courts have traditionally tried to maintain and to encourage continuing parental relationships. The link between a father and child in circumstances such as these is uncertain at best, and a change of name could further weaken, if not sever, such a bond.

302 Minn. at 35–36, 223 N.W.2d at 140.

■ The father–child bond is even more tenuous in the case of an unwed father who has never lived with his child and thus has lacked the opportunity to discharge his paternal responsibilities on a day–to–day basis than in the case of a father whose on–going relationship with his child has been interrupted by divorce. Hence, society's interest in sustaining the custom of having the child bear the paternal surname is particularly urgent when the situation involves a child born out of wedlock.

It is true that some decisions have afforded minimal consideration to the father's interest in having his child bear the paternal surname. Many of the cases have involved egregious conduct on the part of the father.[11] *E. g., Application of Yessner* (Civ.

Ct.N.Y.1969), 61 Misc.2d 174, 304 N.Y.S.2d 901 (divorced mother's petition to change her son's surname to her maiden name granted upon evidence that father, who showed no interest in the child, had been convicted of manslaughter for killing the child's maternal grandfather); *Application of Gallagher* (Civ.Ct.N.Y.1948), 193 Misc. 305, 85 N.Y.S.2d 719 (divorced mother's application to change her daughter's name to mother's maiden name granted upon evidence that father, whose misconduct had led to the divorce, had failed to visit the child or to make nominal support payments and had impliedly abandoned the child by giving a child born of a second marriage the same name as that of the child of the first marriage).

In a few cases the assumption of the stepfather's surname has been allowed despite the absence of wrongdoing on the part of the natural father; the courts seem to have been influenced by the child's own preference for the change. *E. g., Johnson v. Coggins* (Ct.App.1971), 124 Ga.App. 603, 184 S.E.2d 696; *Application of Shipley* (Sup.Ct.1960), 26 Misc.2d 204, 205 N.Y.S.2d 581.

In this case, the father, R.S.H., has not engaged in misconduct which might justify forfeiture of his interest in having J. bear the paternal surname—as has been customary. We have said that the siring of an illegitimate child is not, in itself, a crime. *J. E. G. v. C. J. E.* (Ct.App.1977), Ind.App., 360 N.E.2d 1030.

R.S.H. has already made payments for the support of J., has testified to his willingness to provide support in the future, and has indicated his desire to exercise visitation rights. J. is not of sufficient age and maturity to voice a preference for or against the proposed change of surname; hence, those cases in which the father's

11. In other cases the natural father's wrongdoing has been less flagrant, but nonetheless substantial. *E. g., Application of Williams* (Civ.Ct. N.Y.1976), 86 Misc.2d 87, 381 N.Y.S.2d 994 (mother's application to change her children's name to that of their stepfather granted upon evidence that biological father had failed to visit his children for 12 years although he had

paid support regularly); *In re Russek* (Ct.App. 1974), 38 Ohio App.2d 45, 312 N.E.2d 536 (permitting change of teen–aged son's name to that of their stepfather upon evidence of biological father's failure to support or manifest interest in them and son's desire to assume stepfather's surname).

interest has been diminished by virtue of an older child's choice of name are inapplicable. Changing J.'s name to that of his natural father would be consistent with the public policy favoring preservation of the father–child relationship. And, perhaps more importantly, such a change avoids a "fair indication that the child is illegitimate." *Petition of Harris, supra.*

 Despite the foregoing rationale, D.R.S. insists that the child should carry the maternal surname because J. will be living with her. Several courts have rejected the argument that a child should forfeit the paternal surname to lessen maternal inconvenience or confusion; the father's interest in having the child bear the paternal surname is deemed more significant than the mother's interest in avoiding embarrassment. *E. g., Laks v. Laks, supra* (ordering divorced mother who had appended her maiden name to the children's paternal surname to reinstate father's name); *West v. Wright* (1971), 263 Md. 297, 283 A.2d 401 (refusing to permit children's name to be changed to that of mother's second husband). In *Petition of Hauptly, supra,* in which a married mother sought to regain her maiden name, our supreme court declared that potential embarrassment arising from a difference between the surnames of petitioner and her child did not justify denying the petition. Although *Hauptly* is not on point, that decision does indicate that embarrassment is not a compelling factor in the court's consideration of a name change petition.

Our decision is not intended to suggest that a mother has no interest in her child's name. The court in *Laks v. Laks, supra,* in discussing the nature of that interest, found merit in the following contention by the mother:

> Appellant claims that the custom of using the father's surname was a result of the subservience of women in society; the inequality of the sexes. Thus, she maintains, elimination of the inequality between the sexes gives her an interest equal to that of the father and to recognize only the interest of the father is an

impermissible classification based on sex .... Therefore, she argues, the name "Eliot–Laks" is an appropriate recognition of the interests of both parents in a child's name.

25 Ariz.App. at 61, 540 P.2d at 1280.

Nevertheless, the court, emphasizing that the case involved a change of name rather than the initial naming of a child, found that retention of the paternal surname would promote the best interests of the children.

In dealing with issues similar to the one raised in the case at bar, a few courts have reached results contrary to ours. For example, in *Application of Biegaj* (Civ.Ct.N.Y. 1941), 25 N.Y.S.2d 85, the court denied an application by a six–year–old child to have his name changed from that of his unmarried mother to that of his putative father. The court gave effect to its policy against granting such applications absent a compelling reason: "It is better for [children] to wait until they have reached maturity. When the child reaches the age of judgment, he may not wish to bear the name of [the putative father]. He should not be bound by the wishes of his mother, who may not now be acting, out of her best judgment, for his future interests." *Id.* at 86.

*Biegaj* is factually distinguishable from the instant case. The putative father in *Biegaj,* who had married another woman following the child's birth, had been ordered to support the child but still denied paternity and objected to the use of his name. R.S.H., on the other hand, has voluntarily admitted paternity and seeks to exercise parental rights and discharge parental responsibilities. The logic of the court in *Petition of Harris, supra,* is thus relevant: "The weight of authority appears to be that absent extreme circumstances a father who exercises his parental rights has a protectable interest in his children bearing his surname and this interest is one *quid pro quo* of his reciprocal obligation of support and maintenance." 236 S.E.2d at 429.

In *State v. Tedeno* [1979] 6 Fam.L.Rep. (BNA) 2032, another decision contrary to

ours, the court determined that an unwed father's objection did not preclude retention of the mother's surname on their child's birth certificate. The court observed that although recent statutory and case law evince heightened concern for the rights of unwed fathers, "the concern expressed is that an unwed father be accorded the same, not more, rights as an unwed mother." *Id.* In determining that the child should retain the mother's name, the court found conclusive the fact that the mother would have custody and be the primary caretaker of the child. The opinion is silent with respect to any misconduct or abandonment of parental rights and duties by the father.

 So we conclude that when, as here, there is evidence that a natural father acknowledges and supports his child born out of wedlock, takes an interest in the child's welfare, and is not guilty of such wrongdoing as would render retention of his name positively deleterious to the child, requiring the child to bear his surname is not an abuse of discretion.

 We emphasize that our role in reviewing a trial court's decision for abuse of discretion is a limited one. The evidence is not reweighed, but must be viewed in the light most favorable to the appellee. *Geberin v. Geberin* (1977), Ind.App., 360 N.E.2d 41. *See also Wireman v. Wireman* (1976), 168 Ind.App. 295, 343 N.E.2d 292. The trial court's judgment is not reversed unless it is "*clearly against the logic and effect of the facts and circumstances* before the court or the reasonable, probable and actual deductions to be drawn therefrom." *Dunbar v. Dunbar* (1969), 145 Ind.App. 479, 483, 251 N.E.2d 468, 471 (emphasis supplied). *See also State ex rel. Thrasher v. Hayes* (1978), Ind.App., 378 N.E.2d 924.

It is true that in *City of Elkhart v. Middleton* (1976), 265 Ind. 514, 356 N.E.2d 207, our supreme court said that "an abuse of discretion . . . results not only when an exercise of discretion is without reason, but also when it is based upon impermissible reasons or considerations." *Id.* at 518, 356 N.E.2d at 211. However, in *Thornton v. Pender* (1978), Ind., 377 N.E.2d 613, Justice

Prentice, who also wrote the opinion in *City of Elkhart*, limited this stricter standard of review to an *interlocutory appeal* questioning the exercise of judicial discretion. He expressed approval of the general rule that "[a] court on appeal will affirm the trial court's decision if it is sustainable upon any theory." *Id.*, 377 N.E.2d at 620. *Accord, Ross v. Review Board of Indiana Employment Security Division* (1962), 243 Ind. 61, 182 N.E.2d 585; *Board of Zoning Appeals v. Eberle* (1980), Ind.App., 403 N.E.2d 1114.

 The trial judge's hapless remarks about the women's liberation movement may or may not have influenced his decision. Such an expression of his personal opinion was inappropriate. Nevertheless, there is in this case a rational basis for his decision as being in the best interests of the child, as we have indicated by our analysis of the relevant statutory and case law. We will not presume that a trial court erred, but rather will indulge in any reasonable presumption supporting the judgment. *First National Bank of Mishawaka v. Penn–Harris–Madison School Corp.* (1970), 255 Ind. 403, 265 N.E.2d 16; *Van Bibber v. Norris* (1980), Ind.App., 404 N.E.2d 1365; *In re Dreflak* (1980), Ind.App., 402 N.E.2d 1284.

Judgment affirmed.

SULLIVAN, J., concurs in result with opinion.

SHIELDS, J., dissents with opinion.

SULLIVAN, Judge, concurring in result.

While I agree that the judgment of the trial court must be affirmed because we may not substitute our discretion for that of the trial judge, I find myself in agreement with Judge Shields's dissent except to the extent that she finds an abuse of discretion as a matter of law. More particularly, I agree that many of those factors emphasized in Chief Judge Buchanan's opinion should be given limited, if any, significance in a determination to change a child's surname from that of the natural mother to that of the biological father. The overrid-

ing, if not only, consideration must be the best interest of the child.

Notwithstanding, however, that the trial judge articulated an extraneous and irrelevant personal consideration, i. e., his opposition to the "women's lib thing", I do not see in it sufficient undermining of the proceeding as to set aside the judgment.

SHIELDS, Judge, dissenting.

I agree with the majority opinion as I interpret it as holding the trial court had the authority to change J.'s surname if it found, in its discretion, the change in surname was in the child's best interest. However, thereafter I disagree with the majority.

Mother has been employed for over a year and a half as director of operations of a company. She earns $14,500 annually. As of the date of the hearing, she personally has paid in full medical expenses required by the child of over $1,300. She presently carries medical insurance covering the child. She agreed to forego all child support if the child retains her name. Her reason for asking the child's name not be changed is:

"A ... First of all, I am single. I was never married to the defendant, do not intend to be married to the defendant. Should I ever marry again, it is my intention to retain my maiden name. Therefore, I feel that [J.] will never be confused by having the name changed. I feel that—well, [R.S.H.] feels that he will wonder why he doesn't have his father's name and it is my intent to explain the situation to him and that I feel it is best that our names be consistent since he will be living with me.

"THE COURT: How do you know that you won't lose custody of him and that he won't go to the father?

"THE WITNESS: I beg your pardon.

"THE COURT: How do you know that at some point and time in the next eighteen years that you couldn't lose custody and that the custody could go to the father and then there would be confusion.

"THE WITNESS: That's always a possibility but I don't feel that my behavior would warrant lose [sic] of custody.

"THE COURT: Okay. Go ahead."

Father has paid an unspecified amount of support since the child's birth. He has been employed as a waiter at one restaurant for one and one–half weeks where he anticipates an income of $200 a week. He was previously employed as a waiter for a month at another restaurant. He is willing to pay $25 per week support and is willing to pay one–half of the child's medical bills, past and future, not covered by insurance. His reason for asking the child's name be change to his is:

"Q And, would you tell me what name you would like the child to have?

"A [J.C.S.H.]

"Q You would like the child to bear your name?

"A Yes."

In reciting the evidence I have set forth all the evidence presented on the issue of the child's surname, including any evidence that relates to the majority 's discussion of the policy considerations involved. However, I wish to make clear that I seriously question the validity of several of these policy considerations.

(1) Traditional use of paternal surname.

This tradition is valid only for legitimate children. The tradition for illegitimate children is that they bear the mother's surname.

(2) Use of paternal surname facilitates establishment of paternal relationship for claims to Social Security benefits, intestate succession, and insurance benefits.

An illegitimate child whose paternity is established may claim Social Security benefits through mother as well as father and may be the beneficiary of certain types of mother's group insurance policies as well as father's where beneficiaries are established by law unless specifically changed by the insured. For purposes of intestate succession an illegitimate child

may only inherit through the maternal line unless the child's paternity has been established by law during the lifetime of the father or the putative father marries the mother and acknowledges the child as his own. IC 29–1–2–7 (Burns Code Ed.).
(3) Substantial financial asset of paternal surname.

There is no evidence in this case as to whether or not the paternal surname would indeed constitute an asset to child. I would point out that in today's society there is no just reason to assume the maternal surname will not be as substantial a financial asset as the paternal surname.

(4) Mother's maiden name is an indication of illegitimacy.

The use of mother's maiden name is not an indication of illegitimacy without knowledge that, in fact, the surname is the mother's maiden name. People who know the mother well enough to know her maiden name will doubtless also know whether she has ever been married and whether the child is illegitimate. Others, who do not know mother so well, will not be aware that the name shared by mother and child is actually mother's maiden name and will not be surprised by the fact that mother and child have the same surname. Rather, a child bearing a different name from the mother is as likely, if not more so, to raise inquiry as to the circumstances resulting in the name discrepancy.

(5) Retention of paternal surname strengthens father–child relationship.

In a paternity action there generally is no such relationship; in fact, the relationship is vigorously denied. It is one that is to be established. If a name is important to the strengthening of the father–son relationship, it is just as logical to say it is important to strengthening the mother–son relationship.

(6) Wrongdoing on the part of the father.

I agree with the reasoning of this policy statement as far as it goes; however, this consideration should be extended to encompass the wrongdoing of either par-

ent. In this case there is no evidence as to wrongdoing on the part of either parent.

(7) Child's preference.

I feel this is an important consideration, but it is irrelevant in this case due to the infancy of the child and the lack of evidence presented.

(8) *Quid pro quo* for obligation of support and maintenance.

This argument assumes the father alone will support the child and completely ignores the fact the mother has a coexisting obligation. IC 31–4–1–2 (Burns Code Ed.). In this case the evidence shows the child will be living with the mother who will bear the primary obligation for support. In addition, this policy consideration deals with the interest of the parent in having the child bear his or her name rather than the best interest of the child which is the determining criterion.

In reviewing the above factors it is important to observe they are derived from cases in which a mother sought to change her child's surname from that of her former spouse and the child's biological father, a situation so factually different as to make the factors of questionable validity.

The only evidence presented on the policy consideration which I find to be relevant to the ultimate question–the best interest of the child–is the mother's testimony as set forth above. Father presented no evidence as to the best interest of the child.

Furthermore, in light of the judge's commentary I am forced to reach the opinion that consideration of the child's best interest in this particular proceeding was undermined by the personal opinion of the trial court expressed on the record as follows:

[Counsel for D.R.S.]: Judge, maybe for the record we should enter our stipulation so Your Honor knows what we have agreed to at this point.

"THE COURT: Alright. Fine.

"[Counsel for D.R.S.]: For the record, the parties have stipulated . . .

\* \* \* \* \* \*

"[Counsel for D.R.S.]: And, subject to the Court approval, he will pay $25.00 per week as child support..... At issue will be the allocation of the medical bills, the visitation and the name of the child, Your Honor.

"THE COURT: What do you mean, 'the name of the child'?

"[Counsel for D.R.S.]: The present name of the child is [J.C.S.] and [D.R.S.] wants the baby to retain her name and [R.S.H.] wants the baby to take his name.

"THE COURT: I would take a very dim view on the amount of support if the name is not changed.

"[Counsel for D.R.S.]: On the amount of the support?

"THE COURT: Uh huh.

"[Counsel for D.R.S.]: I am not following you.

"THE COURT: Well, I imagine my award so far as the amount the defendant is to pay for support is going to be substantially less if the father doesn't have the right to have that child have his name. If you want me to take a five-minute recess, you might want to discuss that with your client.

"[Counsel for D.R.S.]: No, that would not pose any problem with us, Your Honor, and we would be willing to let the Court set the amount of child support.

"THE COURT: Because I absolutely think it is absolutely wrong. I am violently opposed to it. If they want to play women's lib, then let them call it all by themselves.

[Evidence concluded.]

"THE COURT: .... The support order will be as agreed to at $25.00 per week.

\* \* \* \* \* \*

"THE COURT: Well, this women's lib thing just makes me furious and I will put it on the record."

Therefore, I find the trial court abused its discretion in ordering the child's surname changed.

I vote to reverse and remand for a new trial.