657 A.2d 856

ALAN GUBERNAT, PLAINTIFF–RESPONDENT, v. KAREN
E. DEREMER, DEFENDANT–APPELLANT.

Argued January 18, 1995—Decided May 11, 1995.

*Lawrence S. Lustberg* argued the cause for appellant (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Barbara A. Hedeen,* of counsel; *Mr. Lustberg* and *Jonathan Romberg,* on the briefs).

*James C. Richardson,* argued the cause for respondent (*Mr. Richardson,* attorney; *Anthony R. Cambria,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

The question presented by this appeal concerns the right of a father, in cases involving disputes over a child's surname, to insist that the child bear his surname. The issue arises in the context of a child, born to unmarried parents, who was given his mother's surname at birth, the father having refused to acknowledge paternity. When his paternity was established by tests performed approximately seven months later, the father acknowledged paternity and commenced visitation. Shortly thereafter, the father instituted litigation seeking joint custody, increased visitation, and a change of the child's surname. The trial court awarded the father joint custody and increased visitation, but the child's mother retained primary physical custody. The trial court, recognizing "the father's interest in maintaining his relationship with his child for their mutual benefit," ordered that the child assume the father's surname. The Appellate Division affirmed in an unreported opinion.

The recognition by the courts below of a preference for paternal surnames is supported by Western custom and law spanning more than six centuries. The practice of children assuming the father's surname is traceable to the English medieval property system in which the husband controlled all marital property. That preference continued in America, reflecting not only the long-standing English tradition but also the societal distinctions in the status of men and women. Until the latter part of this century, the assumption that children would bear their

father's surnames was a matter of common understanding and the preference for paternal surnames was rarely challenged. But the historical justifications that once supported a tradition in the law for children to bear paternal surnames have been overtaken by society's recognition of full legal equality for women, an equality that is incompatible with continued recognition of a presumption that children must bear their father's surname. That presumption shall no longer apply in this State. We hold instead that in contested cases the surname selected by the custodial parent—the parent primarily charged with making custodial decisions in the child's best interest—shall be presumed to be consistent with that child's best interests, a presumption rebuttable by evidence that a different surname would better serve those interests. We apply that rule of law to the facts at hand, and reverse the judgment of the Appellate Division.

I

Scott Thomas Deremer was born July 4, 1991, the son of plaintiff Alan Gubernat and defendant Karen Deremer. The parties decided not to marry. Plaintiff initially doubted his paternity, and was not present at the birth of Scott, nor was he named on Scott's birth certificate. Karen assumed physical custody of Scott and has retained custody throughout. Alan first saw his son in July or August 1991, but "didn't know [Scott] was my son at that time." After plaintiff requested a determination of paternity, blood tests were conducted in January 1992. In February 1992, when the tests confirmed that Alan was the father, he immediately admitted paternity, contacted Karen, and attempted to establish a relationship with his son. Alan and Karen informally arranged for Alan to visit his son two or three times each week.

Subsequent disagreement between the parties regarding the extent of Alan's visitation rights resulted in an order issued by the trial court in March 1992 granting Alan temporary visitation rights, consisting of two hours on Sunday afternoon and two hours on Wednesday evening. Shortly thereafter, Alan instituted this

action seeking joint custody of Scott, joint consultation on decisions affecting his education, health, and welfare, greater visitation privileges, and the change of his name to Scott Thomas Gubernat. In May 1992, Alan and Karen agreed to modify Alan's visitation schedule to permit visitation every Sunday from 10:00 a.m. to 5:00 p.m.

In July 1992, the trial court held a hearing on issues related to custody and visitation. Based on proofs presented at the hearing, the court found "as a fact that both parents, both the mother and father, are loving parents of this child." The evidence adduced indicated that Karen had been employed for the past five years by the World Apostolate of Fatima. She testified that she had conscientiously discharged the day-to-day responsibilities of parenthood, that she had borne sole responsibility for Scott's care during infancy, and had received strong support from her family. The evidence confirmed that Alan also enjoyed family support in caring for Scott, both from his parents, who lived next door, and from his sisters. Alan was self-employed as a mason and was described by a construction contractor as reliable, hard-working, and competent. He testified to his close relationships with his sister's children. He stated that during visitation he would play with his son, or take him to visit members of his family. Alan testified that he had purchased equipment that Scott needed, including a stroller, a walker, a baby carriage, and a play pen.

When asked by his counsel why he wanted his son to bear his surname, Alan testified:

> Well myself, I would want my son to recognize who his father is. And I know that's not just in the name alone, it's also the time we spend. It is important for me when he deals with other children as he gets older to see that he, yes he does have a father and he has a father who cares and will always be there for him.

On cross-examination, Alan responded that his desire for Scott to bear his surname was intended to assure Scott that "he always has a father." Alan stated that by bearing his surname, his son would "know that whatever happened in the future, if God forbid if Karen moves to another State or something like that, that ... he

will always have a father and know that he was always there for him or made every attempt to."

Karen testified that she opposed both the imposition of the paternal surname and the use of the hyphenated name Deremer–Gubernat. She explained the basis of her objection: "I believe since the child's birth I have been the primary caretaker of the child. I also feel that it's easier if the child's last name matches my last name. We live in a small local area. The Deremer name is know[n]." The judge questioned Karen directly whether she ever "expect[ed] to get married," because if "some day assuming you get married ... you would have a situation where you have one name and your child has another name." Karen replied that that was a "difficult question[ ] to answer under the circumstances," but "[r]ight now I can say no."

The trial court awarded Alan joint legal custody of Scott and granted liberal visitation privileges. Additionally, the court determined that the child should assume the surname of the father. The court noted that the "father's desire to have progeny and also to have some one carry on his name is proper. It's a right that the father has." The court determined that the paternal right to name the child carries little relevance if its purpose is in "protecting [the father's] ego or in preserving his perceived male prerogatives," but to the extent "the right recognizes the father's interest in maintaining his relationship with his child for their mutual benefit, it becomes highly relevant." Concluding that the effect on the child of carrying the maternal surname might be to contribute to the child's "[estrangement] from the father who exhibits a desire to preserve a paternal relationship," the court ruled that the child will henceforth be known as Scott Thomas Gubernat. Defendant obtained a stay in order to appeal the decision with respect to the name change. See Rule 2:9–5.

In January 1993, the Appellate Division remanded the matter to the Chancery Division "to permit the aforesaid trial judge to clarify the findings of fact and conclusions of law with respect to the furtherance of the best interests of the infant child in effecting

a change of the child's surname." In March 1993, the trial court issued an opinion supplementing its prior decision. The court reiterated its determination that the child's interests would not be served by retaining the maternal surname, which could represent to the child a rejection by his father, although the "plaintiff ... has expressed a continuous and enthusiastic desire to participate actively in the upbringing of his son." The court rejected Karen's "main objection to the child's retention of the father's surname [as] that she has been the primary caretaker of the child since his birth, a factor which she claims should allow the child to take her surname."

In an unreported opinion, the Appellate Division affirmed. The court found the equities were no worse than in equipoise, but noted that a child's paternal identity and its "resulting bond with his father" was of importance in strengthening the relationship between the child and the non-custodial parent, and therefore determined that bearing the paternal surname was in the best interests of the child. We granted certification. 137 *N.J.* 313, 645 *A.*2d 141 (1994).

## II

The term "surname" comes from the French word "surnom"— "sur" meaning above or beyond, "nom" from the Latin "nomen," meaning name. Yvonne M. Cherena Pacheco, *Latino Surnames: Formal and Informal Forces in the United States Affecting the Retention and Use of the Maternal Surname*, 18 *T. Marshall L.Rev.* 1, 5 (1992). The use of surnames is a relatively recent historical practice. "In the early life of all races surnames were unknown, while given names have been used from the most distant times to identify and distinguish a particular individual from his fellows." *Smith v. United States Casualty Co.*, 197 *N.Y.* 420, 90 *N.E.* 947, 948 (1910). "From the beginning to the midpart of the Middle Ages, the term 'name' referred to the given or first name of the individual." Cherena Pacheco, *supra*, 18 *T. Marshall L.Rev.* at 5 (footnote omitted).

The Anglo–Saxon tradition of surnames dates back to the Norman Conquest in 1066. *Ibid.; In re Shipley,* 26 *Misc.*2d 204, 205 *N.Y.S.*2d 581, 586 (Sup.Ct.1960) ("Surnames are said not to have been used in England until the Norman conquest."). The Normans introduced a number of non-English given names, such as "Richard," "Robert," and "William," of which William "became and remained the single most common recorded name in the twelfth century." M.T. Clanchy, *England and Its Rulers: 1066– 1272* 57 (1983). However, although each village or town might have had only " 'ten Williams, [and] a similar number of [Roberts and Richards,]' ... distinctions often needed to be made if two villagers were talking about [William], misunderstandings would arise if each had a different [William] in mind. So qualifications were added...." Cherena Pacheco, *supra,* 18 *T. Marshall L.Rev.* at 6 n. 15 (quoting J.N. Hook, *Family Names* (1982)). "Beginning with the influence exerted by the Normans following their conquest of England in the eleventh century, the practice of adding second names became more common as the relative scarcity of Christian names led to a great number of people bearing the same name." Richard H. Thornton, Note, *The Controversy Over Children's Surnames: Familial Autonomy, Equal Protection and the Child's Best Interests,* 1979 *Utah L.Rev.* 303, 305; *see also* G.S. Arnold, Note, *Personal Names,* 15 *Yale L.J.* 227, 227 (1906) ("At that time, owing to the paucity of Christian names (probably an estimate of two hundred would cover them all), it became customary to add a name to that of baptism."). Although the growth of population and the development of cities required a means of distinguishing between individuals with identical given names, the Normans also introduced a number of social practices—the imposition of a feudal land system and the use of primogeniture as a system of inheritance—that likewise spurred the development of surnames. *See* Beverly S. Seng, *Like Father, Like Child: The Rights of Parents in Their Children's Surnames,* 70 *Va.L.Rev.* 1303, 1323 (1984).

Surnames came from a number of sources, including "accident, caprice, taste, and a multitude of other causes." *Smith, supra,* 90

*N.E.* at 948. "It is to be noted, however, that the surname in its origin was not as a rule inherited from the father, but either adopted by the son, or bestowed upon him by the people of the community where he lived." *Ibid.* Surnames often were derived from the area in which a person lived. Men who owned property commonly took their surnames from their places of habitation. *Ibid.* "In the rush of conversation some words would get passed over which caused surnames to flourish. Thus, one ordinarily described as 'John from the hill' might eventually [become] 'John Hill.' " Cherena Pacheco, *supra*, 18 *T. Marshall L.Rev.* at 6 (quoting J.N. Hook, *Family Names* (1982)). Artisans and craftsmen derived surnames from their occupations. "Thus, John the carpenter, evolved into John Carpenter." *Ibid.* In addition, a particular attribute or characteristic of a person could become that person's surname:

> So, as suggested, something in the appearance, character, or history of the individual gave rise to the surname, such as his color, as black John, brown John, white John, afterwards transposed to John Brown, [etc.]; or it arose from his bulk, heighth, or strength, as Little, Long, Hardy, or Strong; or his mental or moral attributes, as Good, Wiley, Gay, Moody, or Wise; or his qualities were poetically personified by applying to him the name of some animal, plant, or bird, as Fox or Wolf, Rose or Thorn, Martin or Swan; and it was in this way that the bulk of our surnames ... originated and became permanent.
>
> [*In re Snook*, 2 *Hilt.* 566, 570 (N.Y.Ct.Common Pleas 1859).]

"To give their children unique names, parents combined thematic words such as 'courage' or 'peace' to create compound names such as Ecgbeorht, the modern Egbert, meaning 'bright sword,' or Wulfraed, meaning 'wolve's cunning.' " Seng, *supra*, 70 *Va.L.Rev.* at 1323.

Additionally, surnames expressive of kinship were chosen. "The Normans brought with them a custom of naming sons after their fathers (as in Ray son of Hugh) as a convenience to the feudal system: the feudal lord could thus more easily identify sons of the soldiers most loyal to him." *Id.* at 1324. However, patronymics, a name derived from that of the father, was neither compelled nor universal:

Inquiry into the naming practices of Western societies demonstrates that names ordinarily express kinship, but not necessarily paternity. Matronymics, names derived from the maternal line, have been employed in several Western cultures, including modern Spain and medieval England. In England, at least as late as the fourteenth century, both sons and daughters adopted their mothers' surnames, often upon succeeding to their mothers' estates or in hopes of doing so. Men also adopted their wives' surnames if the couple inherited property from the woman's family. The children of such couples presumably also took their mothers' surnames. Even among the non-propertied classes, children sometimes used the maternal surnames. Historian and linguist C.M. Matthews explained the custom:

[A]n illegitimate boy might be called by his mother's name, but it was equally natural and useful to refer to the son of a highly respected widow in the same way, or even, when the father was alive but away for years on some distant expedition or married to a dominant wife, the lad might be spoken of ... as belonging to Moll or Alison or Margery.

The paternal surname, even if initially bestowed, did not necessarily survive the father's absence. Many of these English matronymics are still in use. As many as one-tenth of contemporary English surnames of relationship (as contrasted to those derived from names of places or occupations) were originally matronymics.

[*Id.* at 1321–22 (footnotes omitted) (brackets in original).]

Eventually the medieval property structure, which invested all marital property in the husband, and the firm and exclusive establishment of primogeniture in the fourteenth century, resulted in the widespread use of hereditary paternal surnames. "Some time after the early fourteenth century, surnames began to serve as hereditary family names, partly because the inheritance of property was often contingent upon an heir's retention of the surname associated with that property." Thornton, *supra,* 1979 *Utah L.Rev.* at 305; *see also* Cynthia Blevins Doll, Note, *Harmonizing Filial and Parental Rights in Names: Progress, Pitfalls, and Constitutional Problems,* 35 *How.L.J.* 227, 229 (1992) ("The custom of patrilineal succession evolved from the medieval property system, in which the husband controlled all marital property. . . . In addition, a married woman in medieval times could not contract or maintain suit in her own name. The male was the legal representative of the family and, as such, enjoyed the unilateral right to name his family.") (footnote omitted). "The custom of patrilineal succession seems to have been a response to England's medieval social and legal system, which came to vest all rights of ownership and management of marital property in the

husband." *In re Schiffman*, 28 *Cal.*3d 640, 169 *Cal.Rptr.* 918, 920, 620 *P.*2d 579, 581 (1980). As one commentator noted, the mechanics of recording entitlement to land prompted the retention of the paternal surname:

> "The land could be claimed and awarded only at the Manorial Court, being held 'by copy of the Court Roll,' which meant that the life tenant's name was inscribed there on permanent record. This system provided a direct incentive to men to keep the same surname that had been put down on the roll for their father or grandfather. And even younger sons—having in mind the uncertainty of life— might think it just as well to use the name too, even if it was Whalebelly or Chickenhead."
>
> [Seng, *supra*, 70 *Va.L.Rev.* at 1325 (quoting C. Matthews, *English Surnames* 43– 44 (1967)).]

"Allowing the husband to determine the surname of their offspring was part of that system, wherein he was the sole legal representative of the marriage, its property, and its children." *In re Schiffman, supra*, 169 *Cal.Rptr.* at 920, 620 *P.*2d at 581. "Given the secondary status afforded to women at those times, it is not surprising that the masculine lineage was chosen." *M.D. v. A.S.L.*, 275 *N.J.Super.* 530, 533, 646 *A.*2d 543 (Ch.Div.1994).

The customary use of hereditary parental surnames was further institutionalized during the reign of Henry VIII of England (1509– 1547) in the early sixteenth century. The King established the Parish Registry System governing the recording of births, marriages, and deaths. *In re Shipley, supra*, 205 *N.Y.S.*2d at 586. Each parish had to keep records of the births, marriages, and deaths of the parish inhabitants. "The effect was to encourage families to identify themselves under the father's name for recording purposes." Shirley Raissi Bysiewicz & Gloria Jeanne Stillson MacDonnell, *Married Women's Surnames*, 5 Conn.L.Rev. 598, 600 (1973); *see also In re Snook, supra*, 2 *Hilt.* at 571 ("[T]his recording of such events in every family, led to the use of one name to designate the members of one family, which the record served to perpetuate; transmitting it from father to son, until the practice became general for all descendants to bear, and become known by, the name of a common ancestor."); Thornton, *supra*, 1979 *Utah L.Rev.* at 305–06 ("The trend seems to have been

hastened by the promulgation of a regulation during the reign of Henry VIII that required a record to be kept in every parish of the births, marriages, and deaths of the parish inhabitants, with legitimate births generally being recorded in the name of the father."); Doll, *supra,* 35 *How.L.J.* at 229 ("The budding tradition further continued when Henry VIII required marital births to be recorded under the name of the father."). Certain benefits of that practice accrued to the Crown:

> [E]asier identification of the citizen would permit the government to call upon the citizen for purposes of taxation and other ways of serving the government.
>
> The government bestowed the patronymic name upon each child whose parents were married, thus further legitimizing the child through the naming process. The father was also legitimized for bringing forth a new heir and subject to the king.
>
> [Cherena Pacheco, *supra,* 18 *T. Marshall L.Rev.* at 7 (emphasis omitted).]

Inevitably, the institutionalized tradition of assuming the hereditary patronymic surname, and the secondary legal status of women in England, diminished the importance of the maternal surname. As one commentator observed:

> The matronymic name, on the other hand, was not even considered in this naming or recording process, nor was it viewed with the same level of legitimacy as that of the paternal name. Although it was the mother who gave birth, and who gave to the child part of her identity, she could not give the child her name. The English Crown had no interest in the mother's surname, it was not deemed legitimate or worth perpetuating.
>
> [*Ibid.* (footnote omitted).]

However, a distinction in English common law arose in respect of a child born of unmarried parents. "At common law, an illegitimate child was *filius nullius,* the son of no one, or *filius populi,* the son of the people." *D.R.S. v. R.S.H.,* 412 *N.E.*2d 1257, 1261 (Ind.Ct.App.1980). The child had no mother or father recognized by law, and therefore had no legal rights. Because the child could not inherit property, the impetus to bear the paternal surname was diminished. "[C]ustom did not dictate the name by which an illegitimate child would be known; the child bore the name gained by reputation in the community." *Ibid.; see also Secretary of Commonwealth v. City Clerk of Lowell,* 373 *Mass.* 178, 366 *N.E.*2d 717, 725 (1977) ("It has been reported that under English law an illegitimate child acquired no name at birth, and

could only acquire a surname by reputation."); *M.D. v. A.S.L.,*
*supra,* 275 *N.J.Super.* at 533, 646 *A.2d* 543 ("He acquired the
name of neither mother nor father and only assumed a surname
later in life based on some factor other than lineage."); Thornton,
*supra,* 1979 *Utah L.Rev.* at 312 ("At early common law an
illegitimate child was known as a 'nullius filius,' or a son of nobody,
and consequently did not acquire a hereditary surname from
either his father or mother; his surname was that which he later
gained by reputation.") (footnote omitted).

The traditional use of the paternal surname was brought to this
country by the colonists. Historical review clearly demonstrates
that the continuation of the English custom of patronymic sur-
names in the colonies was intrinsically linked to greater social
forces, particularly the inferior legal status of women. See *In re
Rossell,* 196 *N.J.Super.* 109, 114, 481 *A.2d* 602 (Law Div.1984)
("Names ... are intimately involved with the status of women.").
A 1632 document entitled *The Lawes Resolutions of Womens
Rights* provides an insightful glimpse into the societal and familial
role of woman. The woman, after marriage, is described as a
"poor rivulet [that] looseth her name" on merging with the "Rho-
danus, Humber, or the Thames." Howard Zinn, *A People's
History of the United States* 105 (1980) (quoting ·*The Lawes
Resolutions of Womens Rights* (1632)). " 'A woman as soon as
she is married, is called *covert* ... that is, "veiled"; as it were,
clouded and overshadowed; she hath lost her streame. I may
more truly, farre away, say to a married woman, Her new self is
her superior; her companion, her master....' " *Ibid.* (quoting
*The Lawes Resolutions of Womens Rights, supra* ). Colonial
women had no legal identity separate from their husbands and
were thus subordinated to them:

> Living within a family meant a state of dependence for everyone but the
> patriarch. Women rarely had an independent existence, at least in law. In public
> records women were usually referred to simply as the "wife of," or the "daughter
> of," or the "sister of" some male. Before marriage they legally belonged to their
> fathers and after marriage to their husbands.... With their husbands alive
> women were considered legally to be like children: they could not sue or be sued,
> draft wills, make contracts, or deal in property.
>
> [Gordon S. Wood, *The Radicalism of the American Revolution* 49 (1991).]

In contrast, the rule of a father of the household over his family has been described as a diminutive version of the reign of a king over his people. "The head of the household remained a kind of miniature king, a governor or protector to whom respect and subjection were due." *Ibid.* "It has been suggested that [the] bestowal of the paternal surname upon a child not only has its basis in custom, but also in the absolute role a father had as head of his family." Thornton, *supra,* 1979 *Utah L.Rev.* at 306.

> The father's position in the family was expressed in *The Spectator,* an influential periodical in America and England: "Nothing is more gratifying to the mind of man than power or dominion; and ... as I am the father of a family ... I am perpetually taken up in giving out orders, in prescribing duties, in hearing parties, in administering justice, and in distributing rewards and punishments.... In short, sir, I look upon my family as a patriarchal sovereignty in which I am myself both king and priest."
>
> [Zinn, *supra,* at 106.]

The retention of the English law of primogeniture and the related practice of entail, which allowed the testator to keep the land intact by passing it through the "stem" line of the family, ensured that "[t]he land belonged to the male line" and continued the custom of children receiving the male surname. Wood, *supra,* at 46.

> Most New England farmers, and perhaps most others too, thought mainly of providing for their families and rarely justified their acquisitiveness in any other terms than the needs of their families. What they principally wanted out of life was sons to whom they could pass on their land and who would continue the family name. For Virginians as well as New Englanders, "a man's patrimony ... is a sacred depositum."
>
> [*Ibid.*]

The struggle to survive and prosper and the subsequent Revolutionary War blurred gender roles. "Certainly by 1750 ancient patriarchal absolutism no longer had the same ideological significance it had once possessed," *id.* at 147, and women gained limited practical and legal autonomy. "Married women in the colonies continued in general to have greater legal rights than their counterparts in England (though after mid-century efforts to bring colonial law into line with English common law did at times

legally restrict the rights of wives)." *Ibid.* The American Revolution witnessed working-class women actively participating at both the home-front and battle-front. Women formed patriotic groups, campaigned against British practices, produced propaganda, and cared for and fought alongside men in the last years of the war. Zinn, *supra,* at 108–09. Abigail Adams wrote to her husband, John Adams, in 1776:

> [I]n the new code of laws which I suppose it will be necessary for you to make, I desire you would remember the ladies, and be more generous to them than your ancestors. Do not put such unlimited power in the hands of husbands. Remember, all men would be tyrants if they could.
>
> [*Id.* at 109.]

After the Revolutionary War none of the States, with the exception of New Jersey, granted women the right of suffrage. (New Jersey rescinded the right in 1807. *Ibid.*) Although women actively campaigned in the 1830's and 1840's on behalf of slaves, prisoners, the insane, and themselves, they nevertheless remained a class denied the right to vote, to hold marital property, and to pursue educational opportunities. *Id.* at 123. Reforms that did occur often were either limited or equally constraining. "The passage of the Married Women's Property Acts in most states and in England during the latter half of the 19th Century removed the common law disability but did not achieve equality for women." Bysiewicz & MacDonnell, *supra,* 5 *Conn.L.Rev.* at 601.

Nineteenth-century reformers did attempt to rectify the status of illegitimate children as a "son[/daughter] of nobody," Thornton, *supra,* 1979 *Utah L.Rev.* at 312, by placing the mother and child in a legal family unit. That was accomplished by legislation awarding custody of the child to the mother, consistent with "her duty to support him, as his natural guardian." *Secretary of Commonwealth, supra,* 366 *N.E.*2d at 726; *see also Commonwealth v. MacKenzie,* 368 *Mass.* 613, 334 *N.E.*2d 613, 616 (1975) ("At common law, the father of an illegitimate child had no duty to contribute to the support of his child whereas the mother did have such a duty.") (citation omitted); *Commonwealth v. Hall,* 322 *Mass.* 523, 78 *N.E.*2d 644, 647 (1948) ("'In legal contemplation,

a[n] [illegitimate child] is generally considered as the relative of no one. But, to provide for his support and education, the mother has a right to the custody and control of him, and is bound to maintain him, as his natural guardian.' ") (quoting *Wright v. Wright*, 2 *Mass.* 109, 110 (1806)). One effect of those statutes was to incorporate into law what had already developed as custom— that a child born of unmarried parents would assume the mother's surname. Thornton, *supra*, 1979 *Utah L.Rev.* at 312; *M.D. v. A.S.L.*, *supra*, 275 *N.J.Super.* at 533, 646 *A.*2d 543 ("Over a period of time custom decreed that the child usually assumed his mother's surname."). The assumption of the maternal surname by the child born out of wedlock was not the result of a right or privilege extended to women, but instead was incidental to the societally imposed duty on her to care for the child:

> Prior to the mid-nineteenth century, a child born to unwed parents had the status of filius nullius, a child of nobody. This meant, among other things, that nobody had the right to the custody of the child. Among the ameliorative steps taken in the nineteenth century was the enactment of statutes placing custody in the birth mother. According to legal historian Michael Grossberg, choosing the birth mother as custodian was neither a coincidence nor inevitable. While based in part on the fact that she could be identified easily, the decision also turned on a belief that a mother would be a better parent. As Grossberg says,
>
> [M]aternal preference found its origins in the "cult of domesticity" that pervaded nineteenth-century American culture. These sentiments put immense pressure on legal authorities to place children with their mothers whenever possible....
>
> . . . .
>
> The proposition that the grant of custody rights to mothers was a placement of responsibility rather than an award of privilege is further demonstrated when one looks at the additional rights granted the child at the time the mother was accorded custody rights: the use of the mother's name and an entitlement to inherit from and through her.
>
> [Karen Czapanskiy, *Volunteers and Draftees: The Struggle for Parental Equality*, 38 *UCLA L.Rev.* 1415, 1423–24 (1991) (quoting Michael Grossberg, *Governing the Hearth: Law and Family in Nineteenth Century America* 209 (1985)).]

The broader effect of the nineteenth-century statutes was to create divergent treatment of children based on their birth status. Children born of wedded parents received the paternal surname; children born of unwed parents received the maternal surname. "This assumption of matriarchal surnames paralleled the then

traditional view that an unmarried woman possessed greater rights to the child as opposed to the putative father." *M.D. v. A.S.L., supra,* 275 *N.J.Super.* at 533, 646 *A.*2d 543.

Despite significant gains, twentieth-century American women continued to confront gender-based obstacles. The ability of women to achieve financial and legal independence suffered under the "common-law fiction that the husband and wife are one. This rule has worked out in reality to mean that though the husband and wife are one, the one is the husband." *United States v. Yazell,* 382 *U.S.* 341, 361, 86 *S.Ct.* 500, 511, 15 *L.Ed.*2d 404, 415 (1966) (Black, J., dissenting). American law reflected the subordinate role of women by deferring to the superior status of the father in naming his legitimate child, noting that "[f]rom time immemorial it has been the custom for male children to bear the family name of their father throughout life." *Kay v. Kay,* 112 *N.E.*2d 562, 567 (Ohio Ct.Common Pleas 1953); *see also* Doll, *supra,* 35 *How.L.J.* at 229 ("This practice of paternal name derivation, through centuries of adherence in the United States, became intertwined with American culture and law."). American courts have described that customary right as one of "inherent concern" to the father, *Robinson v. Hansel,* 302 *Minn.* 34, 223 *N.W.*2d 138, 140 (1974), as "the [father's] right to expect his kin to bear his name," *Sobel v. Sobel,* 46 *N.J.Super.* 284, 287, 134 *A.*2d 598 (Ch.Div.1957), as a "natural and commendable desire of the father to have his children bear and perpetuate his name," *Clinton v. Morrow,* 220 *Ark.* 377, 247 *S.W.*2d 1015, 1018 (1952), and as a "natural right [of the father] to have his son bear his name," *De Vorkin v. Foster,* 66 *N.Y.S.*2d 54, 54 (Sup.Ct.1946); *see In re Shipley, supra,* 205 *N.Y.S.*2d at 589 (noting cases that "refer to a 'natural,' 'fundamental,' 'primary' or 'time honored' right"). One early activist described the "natural right" of men to name their children as derived from the maxim that what a man owns, he may name; what he names, he owns:

In 1922, Ruth Hale, advocate of women's right to determine their own names and co-founder of the Lucy Stone League, in discussing the basis for men's demand

that women take their husbands' surnames, articulated the underlying basis of men's expectation that they have the absolute right to name their children:

> Custom said, too, that man owned what he paid for, and could put his name on everything for which he provided money. He wrote his name more often than a little boy with chalk signs his to a fence. He put it on his land, his house, his wife and children, his slaves when he had them, and on everything that was his.
> [Priscilla R. MacDougall, *The Right of Women to Name Their Children*, 3 *Law & Ineq. J.* 91, 138 (1985) (footnote omitted).]

Only the father who "wilfully abandons and neglects his young and helpless progeny, and ignores his responsibility to them, may well be deemed to have no natural paternal desires—and therefore to have forfeited his normal rights—to the perpetuation of his name." *In re Sloan*, 203 *Misc.* 1035, 118 *N.Y.S.*2d 594, 596 (Sup.Ct.1953); Doll, *supra*, 35 *How.L.J.* at 233 ("It was generally agreed that the only time a father could 'forfeit' his right to perpetuate his surname was through some misconduct towards the child, such as willful abandonment.") (footnote omitted).

The twentieth century, however, has produced dynamic social change. Specifically, "[p]rogress toward marital and parental equality has accelerated in recent years," *In re Schiffman*, *supra*, 169 *Cal.Rptr.* at 920, 620 *P.*2d at 581, and women have overcome the vast majority of the traditional forms of legal subordination. "This court [has found] that the society in which we live today is purportedly neither maternal nor paternal. The principle of gender neutrality is evident in the laws as administered by the courts of New Jersey and throughout the legal system; great efforts have been generated to further this concept." *K.K. v. G.*, 219 *N.J.Super.* 334, 337, 530 *A.*2d 361 (Ch.Div.1987). The New Jersey Legislature has, in various contexts, taken steps to remedy past gender-based differences in the rights and responsibilities of parents and spouses. Most relevant are the fields of paternity and custody. In 1983 the Legislature adopted the New Jersey Parentage Act (the Act), which was modeled on the Uniform Parentage Act promulgated by the National Conference of Commissioners on Uniform State Laws in 1973. *L.*1983, *c.* 17 (codified at *N.J.S.A.* 9:17–38 to –59). The Act governs paternity proceedings in this State, providing both procedural and substantive law.

In enacting the law, the Legislature stated: "The New Jersey Parentage Act is intended to establish the principle that regardless of the marital status of the parents, all children and parents have equal rights with respect to each other...." Assembly Judiciary, Law, Public Safety & Defense Committee, *Statement to Senate Bill No. 888*, at 1 (Oct. 7, 1982). "Under the Parentage Act the claims of the natural father and the natural mother are entitled to equal weight, *i.e.*, one is not preferred over the other solely because he or she is the father or the mother." *In re Baby M*, 109 *N.J.* 396, 453, 537 *A.*2d 1227 (1988). The Act also eliminated legal differences between children born in a marriage and children born out of wedlock, following a line of United States Supreme Court decisions "mandating equality of treatment between legitimate and illegitimate children." Assembly Judiciary, Law, Public Safety & Defense Committee, *supra, Statement to Senate Bill No. 888*, at 1.

Seven years later, the Legislature reaffirmed this principle of equality in the context of custody. In 1990, the Legislature substantially amended the laws governing custody, finding that when a marriage dissolves the public policy of this State is to assure that minor children are in frequent contact with, and cared for, by the non-custodial, as well as the custodial, parent. *L.*1990, *c.* 26, § 2 (codified at *N.J.S.A.* 9:2–4). The Legislature determined that "[i]n any proceeding involving the custody of a minor child, the rights of both parents shall be equal." *Ibid.* The Legislature also deleted the preference extended mothers in disputes among parents who have separated but have not divorced, a presumption that provided that "[t]he minor child when in the actual care and custody of the mother in such cases, shall not be taken by the father of such child forcibly or against the will of the mother from her custody." *L.*1990, *c.* 26, § 1. Moreover, the Legislature, in defining the word "parent," struck the phrase "but the word parent shall not include the father of an illegitimate child." *L.*1990, *c.* 26, § 3.

The Legislature clearly has ended gender-based differences in marital and parental rights, whether rooted in law or custom, and instead determined that parental disputes about children should be resolved in accordance with each child's best interests. Sex-based presumptions, such as the "tender years" doctrine, that had survived as a matter of custom for decades, have been replaced by an inquiry focused on the happiness and welfare of the child. *See In re Baby M, supra,* 109 *N.J.* at 453 n. 17, 537 *A.*2d 1227. Courts are required to engage in meticulous fact-finding to determine the "best interests" of the child. *See N.J.S.A.* 9:2–4(c); *In re Baby M, supra,* 109 *N.J.* at 453 n. 17, 537 *A.*2d 1227. "The 'best interests' doctrine is applied in almost every legal disposition involving minors: custody, adoption, abuse and neglect, guardianship, termination of parental rights, and even disposition following juvenile court proceedings." Seng, *supra,* 70 *Va.L.Rev.* at 1313–14 (footnote omitted). Today, "the best interests of the child" is the applicable standard governing most decisions affecting the welfare of children. *See In re Baby M, supra,* 109 *N.J.* at 453, 537 *A.*2d 1227.

■ That standard is also the one that we apply in determining the appropriate surname to be given to a child, regardless of the child's birth status. *See In re Rossell, supra,* 196 *N.J.Super.* at 114–15, 481 *A.*2d 602; *In re Schiffman, supra,* 169 *Cal.Rptr.* at 922, 620 *P.*2d at 583 ("Adoption of a 'best interest' test is but an evolutionary change in the state's rules for resolving parental disputes over children's surnames."); *In re Saxton,* 309 *N.W.*2d 298, 301 (Minn.1981) ("[O]nce a surname has been selected for the child, be it the maternal, paternal, or some combination of the child's parents' surnames, a change in the child's surname should be granted only when the change promotes the child's best interests."), *cert. denied,* 455 *U.S.* 1034, 102 *S.Ct.* 1737, 72 *L.Ed.*2d 152 (1982); Kathryn R. Urbonya, Note, *No Judicial Dyslexia: The Custodial Parent Presumption Distinguishes the Paternal from the Parental Right to Name a Child,* 58 *N.D.L.Rev.* 793, 799 (1982) ("By discarding the presumption that the father has a

primary right to have his child bear his name, courts could attempt to resolve the naming dispute in terms of the child's best interest test.").

However, despite the steps legislatures and courts have taken to eradicate gender-based differences, some courts nevertheless rely on traditional presumptions that obscure a clear evaluation of what constitutes the child's best interests. Those courts have continued to favor the retention and use of the paternal surname by treating the child's best interests as synonymous with the father's best interests. "In resolving disagreements between parents regarding their child's surnames, the 'best interest of the child' test has customarily been defined in terms of the father-child relationship." *In re Schiffman, supra,* 169 *Cal.Rptr.* at 924, 620 *P.*2d at 585 (Mosk, J., concurring); *see also* Urbonya, *supra,* 58 *N.D.L.Rev.* at 796–97 ("In attempting to resolve name disputes, courts frequently borrow the words 'child's best interests' from custody case law and then ascribe a different connotation to these words. Courts generally interpret the child's best interest in terms of the patronymic naming system.") (footnote omitted). For example, the Indiana Court of Appeals has stated that "all agree that the welfare of the child is the paramount consideration in deciding whether a child's name should be changed over the opposition of one parent," *D.R.S. v. R.S.H., supra,* 412 *N.E.*2d at 1263, but in determining what constituted the welfare of the child, the court concluded that "[f]irst, significant consideration is given to the father's interest in having his child bear the paternal surname in accordance with tradition." *Ibid.; see also Flowers v. Cain,* 218 *Va.* 234, 237 *S.E.*2d 111, 113 (1977) (noting with approval "the recognition by other courts of a father's interest in having his child continue to use his name and of the proposition that this parental interest is relevant to a determination of the child's best interest"); *In re Lone,* 134 *N.J.Super.* 213, 220, 338 *A.*2d 883 (Law Div.1975) ("[T]o the extent the [paternal] 'right' recognizes the father's interest in maintaining his relationship with his child for their mutual benefit, it becomes highly relevant."); Seng, *supra,* 70 *Va.L.Rev.* at 1339 ("The need to preserve the father-child bond

is the reason most often given for the paternal surname presumption.").

█ We do not accept the preference that some courts accord to paternal surnames in the context of determining the best interests of the child. *See, e.g., Bobo v. Jewell,* 38 *Ohio St.*3d 330, 528 *N.E.*2d 180, 184–85 (1988) ("We . . . refrain from defining the best-interest-of-the-child test as purporting to give primary or greater weight to the father's interest in having the child bear the paternal surname."). The preservation of the paternal bond is not and should not be dependent on the retention of the paternal surname; nor is the paternal surname an indispensable element of the relationship between father and child. As one author found: "[T]his impairment of the father-child relationship had been an assumption by the courts, and fathers had not introduced circumstantial or scientific evidence of harm. More significantly, children and fathers frequently testify that they would not love each other less if the child bore a different surname." Doll, *supra,* 35 *How.L.J.* at 234 (footnote omitted); *see also* Seng, *supra,* 70 *Va.L.Rev.* at 1339 ("[T]his rationale for the paternal surname presumption confuses the child's best interests with the father's need for a symbol."). Accordingly, in resolving disputes over surnames we apply the best-interests-of-the-child standard free of gender-based notions of parental rights.

## III

Courts applying the best-interests-of-the-child standard consider a number of criteria in determining the advantages and detriments to a child of assuming either the maternal or paternal surname. Those factors include the length of time that the child has used one surname, the identification of the child as a member or part of a family unit, the potential anxiety, embarrassment, or discomfort the child might experience if the child bears a surname different from the custodial parent, and any preferences the child might express, assuming the child possesses sufficient maturity to express a relevant preference. *See M.D. v. A.S.L., supra,* 275

*N.J.Super.* at 535, 646 *A*.2d 543; *In re Schiffman, supra,* 169 *Cal.Rptr.* at 922, 620 *P*.2d at 583; *Cohee v. Cohee,* 210 *Neb.* 855, 317 *N.W.*2d 381, 384 (1982); *Bobo, supra,* 528 *N.E.*2d at 185; *In re Richie,* 387 *Pa.Super.* 401, 564 *A*.2d 239, 241 (1989); Urbonya, *supra,* 58 *N.D.L.Rev.* at 799–800. Courts have experienced difficulty, however, in applying the factors underlying the best-interests-of-the-child standard, possibly because of the speculative quality of the inquiry into the effect that the chosen surname would have on the future welfare and happiness of the child. One author commented that as a result of the vagueness of the standard, "judges have proposed different and frequently conflicting subjective factors for deciding whether a particular name is in a child's best interests—factors that lead to inconsistent resolutions of child-naming controversies." Laura Anne Foggan, Note, *Parents' Selection of Children's Surnames,* 51 *Geo.Wash.L.Rev.* 583, 595–96 (1983) (footnote omitted).

To enhance the predictability of the best-interest standard, some commentators have suggested, and a few courts have adopted, a presumption in favor of the surname chosen by the custodial parent. *See id.* at 597–98 ("By deferring to the custodial parent's choice of a surname, courts could minimize their subjectivity in determining whether a child's surname is suitable."). "The custodial parent presumption [is] not new." MacDougall, *supra,* 3 *Law & Ineq.J.* at 147. That presumption is rooted in a basic principle of family law—that the parent having physical custody of the child is generally accorded broad responsibility in making daily child-rearing decisions. The custodial parent is presumed to act in the best interests of the child in discharging that obligation, an assumption based on the "practical ground that the parent in daily contact with the child is better able to make [daily] decisions about his welfare." Seng, *supra,* 70 *Va.L.Rev.* at 1311. Because the courts award custody on the sole basis of the child's best interest, the custodial parent presumably would be acting in the best interest of the child when he or she names the child. *See* Urbonya, *supra,* 58 *N.D.L.Rev.* at 805 ("[T]he right to select or change a child's name logically coexists with other

custodial rights. To resolve the naming dispute, a court need not reevaluate the traditional factors comprising the child's best interest test because the award of custody creates the presumption that the custodial parent's decision is in the child's best interests.") (footnote omitted). Justice Mosk of the California Supreme Court, concurring in *In re Schiffman, supra,* viewed the custodial parent's decision in naming the child as "at most . . . just one in a long list of ingredients contributing more or less to the child's well-being and adjustment in society," 169 *Cal.Rptr.* at 923, 620 *P.*2d at 584, and advocated the recognition of a judicial presumption in favor of the custodial parent's choice of surname:

> Since the law has long recognized the ability and the right of the parent with custody to choose among the innumerable alternative courses involving the child's welfare, I can see no rational reason to deny that parent a similar right to select the name with which the child will be more comfortable.
>
> Thus I would recognize a presumption that the parent with custody—whether custody was assumed without conflict, by agreement or by court order—has acted in the child's best interest in selecting the name. The selection may be the original name, or a name change for a child of tender years.
>
> [*Ibid.*]

*See also State ex rel. Spence–Chapin Servs. to Families & Children v. Tedeno,* 101 *Misc.*2d 485, 421 *N.Y.S.*2d 297, 300 (Sup.Ct. 1979) ("[T]he significant consideration is that the mother has custody and it is she who will be the primary caretaking figure and who will make the major decisions. . . ."); MacDougall, *supra,* 3 *Law & Ineq.J.* at 147 ("Adoption of the presumption follows logically from the divorce courts' exercise of jurisdiction over the naming of children as incidental to children's care, custody, and control."); Seng, *supra,* 70 *Va.L.Rev.* at 1310 ("The paternal surname presumption is also inconsistent with the long-standing principle of custody and guardianship law that gives the custodial parent or guardian the right to direct the child's upbringing. If anyone other than the child deserves the right to determine the child's name, perhaps that person should be the custodial parent.").

Some states have adopted statutes or regulations that delegate the choice of surname to the custodial parent. Kentucky statutory

law provides that if the mother was not married at the time of conception or birth of the child, and there is no agreement between the father and mother concerning the surname to be assumed by the child, "the child's surname shall be determined by the parent with legal custody of the child." *Ky.Rev.Stat.Ann.* § 213.046(8)(a) (Michie 1994). In the parallel context of children born in wedlock but whose parents are separated or divorced at the time of the child's birth, Pennsylvania regulations state: "If the parents are divorced or separated at the time of the child's birth, the choice of surname rests with the parent who has custody of the newborn child." 28 *Pa.Code* § 1.7(b) (1975); *see In re Schidlmeier*, 344 *Pa.Super.* 562, 496 *A.*2d 1249, 1252 (1985) (interpreting 28 *Pa.Code* § 1.7(b) and concluding that legislative "policy embodied in Section 1.7(b) fairly and practically allocates the responsibility for choosing a newborn child's surname" and is consistent with right of the custodial parent to make decisions affecting the best interests of the child). New Hampshire statutory language mirrors the Pennsylvania provision. *N.H.Rev.Stat. Ann.* § 126:6–a(I)(a) (1993).

To the extent that the subject has been addressed in New Jersey, regulations promulgated by the New Jersey State Department of Health provide that if either parent is unavailable, the choice of name is to be made by the custodial parent. *N.J.A.C.* 8:2–1.3(a)1. If both parents have custody but disagree on the name, the child shall be given a hyphenated surname based on alphabetical order. *N.J.A.C.* 8:2–1.3(a)2.

The presumption that the parent who exercises physical custody or sole legal custody should determine the surname of the child is firmly grounded in the judicial and legislative recognition that the custodial parent will act in the best interest of the child. Accordingly, we adopt a strong presumption in favor of the surname chosen by the custodial parent. However, we readily envision circumstances in which the presumption could be rebutted. A young child who has used the non-custodial surname for a period of time, is known to all by that surname, expresses comfort with

the continuation of that surname, and maintains frequent contact with the non-custodial parent might be ill-served by the presumption that the assumption of the custodial surname would be in his or her best interests. Although we accord the presumption substantial weight, it is not irrefutable.

■■ The non-custodial parent bears the burden of demonstrating by a preponderance of the evidence that despite the presumption favoring the custodial parent's choice of name, the chosen surname is not in the best interests of the child. Courts should examine scrupulously all factors relevant to the best interests of the child and should avoid giving weight to any interests unsupported by evidence or rooted in impermissible gender preferences. *See Bobo, supra,* 528 *N.E.*2d at 184–85; *In re Schidlmeier, supra,* 496 *A.*2d at 1253. The rebuttable character of the custodial-parent presumption serves two ends: it protects the right of the custodial parent to make decisions in the best interests of the child; and it permits judicial intervention, on a sufficient showing by the non-custodial parent, when that decision does not reflect the best interests of the child. *See* Urbonya, *supra,* 58 *N.D.L.Rev.* at 805–06.

We acknowledge that as a result of the standard we now adopt numerous children, whose parents have disagreed about their surnames, will be authorized to bear surnames different from their fathers'. That result can be perceived as conflicting with society's longstanding, customary expectation that children of married parents bear the paternal surname, generating concerns over whether designation of a nontraditional surname might cause the child to experience unnecessary discomfort. Our assumption is that society has become accustomed to and tolerant of departures from the familiar preference for paternal surnames, that that tolerance and acceptance of nontraditional surnames will grow as the practice becomes less uncommon and as the reasons for authorizing deviation from the paternal surname become better understood. That process of enhanced understanding will be gradual and evolutionary. But we are firmly convinced that our authorization of a

strong preference for the surname chosen by the custodial parent not only is consistent with the best interests of the affected children, but also reflects the significant societal changes in womens' rights that require a modification of the age-old preference for paternal surnames.

## IV

We apply the best-interests-of-the-child standard, and the custodial parent presumption, to the present case. Scott is a very fortunate child, having two parents who dearly love and care for him. Our review of the record clearly demonstrates that both Alan and Karen have proven fully capable of discharging their responsibilities as parents. Their willingness to provide for Scott's needs as he grows and matures, rather than the surname Scott bears, is what defines them as parents. " 'Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his "psychological parent" in whose care the child can feel valued and "wanted." ' " *Ali v. Ali,* 279 *N.J.Super.* 154, 168, 652 *A.*2d 253 (Ch.Div.1994) (quoting Joseph Goldstein et al., *Beyond the Best Interests of the Child* 17 (1979)). We are confident, irrespective of whose surname the child bears, that both Alan and Karen will continue to be loving and supportive parents to Scott.

In resolving the issue of the surname, we note that Karen named Scott while she was exercising complete physical custody of him. As the custodial parent, that she was acting in Scott's best interests at that time is presumed. Accordingly, Alan bore the burden of demonstrating by a preponderance of the evidence that a change in surname is in the child's best interests. Such evidence has not been presented. The essence of the evidence introduced in support of the change in surname from Deremer to Gubernat was the need for Scott to know that he "will always have a father." In our view, Alan's devotion, support, and commitment to Scott will ensure that Scott will always know that he has a father. The love of the parent, and not the name of the parent, is

the "adhesive that binds parent and child and, further, gives unique strength and durability to the natural loyalty that the parent holds for the child." *M.H.B. v. H.T.B.*, 100 *N.J.* 567, 574, 498 *A.*2d 775 (1985) (Handler, J., concurring). We reiterate that no empirical or circumstantial evidence has been produced to suggest that the retention of the paternal surname is essential to maintenance of the father-child relationship, and we suggest that such an assumption is predicated on forsaken, gender-based notions of parenthood.

Evidence has not been presented demonstrating that the retention of the Deremer surname would be contrary to Scott's best interests, nor has evidence been adduced that the Gubernat surname would better serve Scott's interests. There has been no showing that the Gubernat surname better advances the psychological, emotional, or developmental needs of the child. Because insufficient evidence exists to support the requested surname change, we hold that the trial court and Appellate Division erred in granting the requested change in surname.

## V

The judgment of the Appellate Division is reversed, and the matter remanded to the trial court for further proceedings consistent with this opinion.

For Reversal and remandment—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.