(130 P.3d 1223)

No. 94,902

J.N.L.M., a minor child, by and through his next friend and natural father, RICKY LEE KILLINGSWORTH, *Appellee*, v. ABBY MILLER, *Appellant*.

Opinion filed March 31, 2006.

*Thomas DeCoursey*, of Kansas City, for appellant.

*Michael Redmon*, of Kansas City, for appellee.

Before ELLIOTT, P.J., GREEN and GREENE, JJ.

GREENE, J.: Abby Miller, natural mother of J.N.L.M., appeals the district court's order changing her child's surname from her own to that of his natural father, arguing that the district court abused its discretion. We agree with her, reverse the district court, and remand for further proceedings.

*Factual and Procedural Background*

J.N.L.M. was nearly 2 years old when Ricky Killingsworth (father) filed a paternity action, stating he believed he was J.N.L.M.'s biological father but seeking DNA testing to confirm his parentage, asking the court to determine a reasonable child support order if DNA testing proved him to be the father, and requesting that the court make appropriate orders as to custody and parenting time. The mother responded that she had never been married to father, father had not been involved in J.N.L.M.'s life since his birth, and father had provided only $50 in monetary support. She also brought a counterclaim for back child support and medical expenses. Before trial, the father filed an amended petition requesting that J.N.L.M.'s surname be changed from Miller to Killingsworth.

The father testified at trial he wished to have J.N.L.M.'s surname be changed to Killingsworth because "I feel that a child, a little boy, should have his father's last name, so I just—I would like it if he had my last name." Later, he again asked for the name change "just because every little boy I know personally has their father's last name. It's just—it's the way I—that's the way I believe it should be." The father further testified that although the mother asked him to sign the birth certificate, he refused because he had asked the mother that the child bear his last name, but she had refused.

Although the father was present at the hospital when J.N.L.M. was born because he believed he was the father, he had allegedly overheard the mother telling his mother that "he isn't Ricky's" in the midst of an argument. He claimed this statement affected his

desire to visit J.N.L.M., but he did continue to visit the child. Originally testifying that he had visited J.N.L.M. approximately 50 times before filing the paternity petition, the father later retracted this claim when confronted with his deposition testimony that for the first year of the child's life he saw the child only two or three times. The father also testified he gave the mother baby supplies valued at $1,296.07 and a total monetary contribution of $50. He claimed that he had learned to properly care for J.N.L.M.'s asthma and noted that the child was allergic to dogs, cats, and dust mites.

The mother testified that the father discontinued his relationship with her for about 2 weeks after she told him she was pregnant. The father told her "he did not want to be a father, and that he wanted to have this time with his friends." After that time, the father did not contact the mother, but he accepted her invitation to be present at the time of J.N.L.M.'s birth. Regarding the birth certificate incident, the mother testified:

"I called him on the Tuesday after I had [J.N.L.M.], I had him early Monday morning and he had went to work that day, and I told him that they came in and we filled out the birth certificate and that it was up here for him to sign. He had to sign it for him to be legally be [J.N.L.M.'s] father, and he refused to—to do so."

All of J.N.L.M.'s hospital records at the time of birth listed his surname as Miller, as did all of his medical records, bank accounts, and his Social Security card. The mother testified that J.N.L.M. knew his full name and answered to his first name followed by "Miller."

According to the mother, her mother and father had provided support for J.N.L.M. in the preceding year. She had received $50 from the father on one occasion, but he refused to provide monetary support on other occasions when the mother asked, and ultimately she stopped asking him for money. The mother denied receiving all of the baby supplies the father allegedly bought for her and J.N.L.M. The court later found the father had not met his burden of proof on providing the baby supplies.

The mother confirmed that she planned to be married in the near future, but testified she would keep her maiden name so

J.N.L.M. would have the same name as her. She testified she did not want to give the name Killingsworth to her child because:

"Ricky did not have anything to do with my pregnancy. Everything that Ricky knew about my pregnancy I had to call and either tell him or tell his mother. He—had made it clear to me that he wasn't ready for a kid and he did not want to settle down and did not want to get married and did not want to raise a child, so I saw no reason for [J.N.L.M.] to live with Ricky's last name when he had made it clear that he did not want to be around."

On cross-examination of mother, the father's counsel elicited the following exchange:

"Q. You agree that it's customary in our culture for men to have the same last name as their father, do you agree with that?

"A. Yes.

"Q. Do you know of any men that don't have the same last name as their father?

"[The mother's counsel]: Your Honor, I object. This is irrelevant to the issues in this case.

"THE COURT: Overruled. The statute in question talks about parentage. I think it's broad enough.

"Q. Let me restate the question. Can you name any men that you know of that don't have the last name of their father?

"A. Um, some—I mean, some people I have known in high school who I don't know personally have—who I'm not friends with have named their children after them and not the father because the father was not in the picture. I do not see any reason . . . ."

The trial judge also examined mother, asking, "When Mr. Killingsworth refused to sign the birth certificate, did he already know that you wanted to use the name Miller on the birth certificate?" The mother replied that he did. During final arguments, the mother's counsel reminded the court that Kansas does not have a "paternal assumption as to the surname of a child," as counsel for the father seemed to argue. The court responded:

"What do you say about the language in [*M.L.M. v. Millen*, 28 Kan. App. 2d 392, 15 P.3d 857 (2000),] that says to construe K.S.A. 38-1130 so that one parent could unilaterally hold the other parent or a court forever hostage as to the name of a child with no recourse makes no sense and would be a result certainly not intended by the legislature? Doesn't that indicate that there would be times when a father's name would not be on the birth certificate for one reason or the other and yet."

In its journal entry, the trial court granted the father's motion to change J.N.L.M.'s last name to Killingsworth, citing the fact that the father's involvement as a father was improving, and citing *M.L.M. v. Millen*, 28 Kan. App. 2d 392, 394-95, 15 P.3d 857 (2000). On the docket sheet, the court noted:

"[C]ourt grants name change of child to surname of killingsworth ms miller is soon to be married to mr marxen mr killingsworth is carrying out finally his paternal duties like in mlm vs mullen 'parentage' as demonstrated by surname is important so court finds that it is best interest of child to have father's surname also there was some game-playing by ms miller at the birth otherwise the name of killingsworth would have been on the birth certificate all along."

The trial court's complete discussion and ruling on the motion for name change was as follows:

"Mr. Killingsworth requests that the child's surname be changed to Killingsworth. The caselaw and statutes are in somewhat of a state of confusion. The most recent appellate pronouncement on the issue is in the case of *M.L.M. v. Millen*, 28 K.A. 2d 392. In that case the Court of Appeals held that a trial court is not precluded by K.S.A. 38-1130 from changing a child's surname even when there is no agreement. It is implicit in that holding that the trial judge must find that good cause for the change has been shown. Here Mr. Killingsworth has assumed, although belatedly, the responsibilities of paternity: he has been for some time and is paying [child] support, he has had parenting time with the child, he has become trained in dealing with [J.N.L.M.'s] asthma. The oral reports of the GAL confirm that Ms. Miller has facilitated Mr. Killingsworth's parental efforts. In the *M.L.M.* case the Court of Appeals cites language of the Supreme Court from *In re the Marriage of Ross*, 245 Kan. 59: 'The Kansas Parentage Act is to provide that every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his or her parentage.' The court finds under the facts here that the last name of the child should be changed from the maiden name of Ms. Miller to the surname of the child's father, i.e., Killingsworth."

The mother moved the court to reconsider, arguing it failed to apply the proper legal test to the name change issue, failed to provide a factual basis for its decision, and misinterpreted the evidence and *Millen*. At the hearing on the motion for reconsideration, the court appeared interested in the "events that occurred at the hospital that caused Mr. Killingsworth's name not to be on the birth certificate in the first place," apparently under the belief that the mother had somehow wrongfully prevented the father's name

being given to J.N.L.M. and reflected on the birth certificate. The mother's counsel also informed the court that her plans to marry had fallen through.

The court denied the motion for reconsideration, stating in part:

"Unfortunately, this court did not express clearly but only by implication its use of the best interest of the child test in its order, stating only that 'The court finds under the facts here that the last name of the child should be changed from the maiden name of Ms. Miller to the surname of the child's father, i.e., Killingsworth.' This court did not state in its order its use of the best interests test, but the court did use that test. Plaintiff argued at the June 24, 2005, hearing that the court could have taken into account events that occurred between the parties at the hospital at the time of birth. The court did not cite in its order of May 10, 2005, each and every fact in evidence that supported its decision regarding the child's name. But Mr. DeCoursey's submission, paragraph 3, is accurate, in that the court did apply the best interests test."

The mother appeals.

*Standard of Review*

Where a child is born to a nonmarital relationship and the issue is whether the child's surname shall be that of the mother's, the father's, or both, we review such determination for an abuse of discretion. *Struble v. Struble*, 19 Kan. App. 2d 947, Syl., 879 P.2d 37 (1994). See *M.L.M. v. Millen*, 28 Kan. App. 2d 392, 394-95, 15 P.3d 857 (2000). Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 44, 59 P.3d 1003 (2002).

*Did the District Court Abuse Its Discretion in Ordering a Change in J.N.L.M.'s Surname?*

Natural mother challenges the district court's order to change J.N.L.M.'s surname from her name, Miller, to the natural father's surname, Killingsworth. She argues that the court failed to apply the proper legal standards and ignored undisputed evidence

"that it would be in the best interests of the child to keep his mother's name when the child had used that name since birth, knew his name, had Social Security and medical records in that name, had lived only with his mother and her parents since birth, and had been virtually unsupported by the father until the time of trial."

Despite the district court's assertion that our "caselaw and statutes are in somewhat of a state of confusion," we believe that the legal standards applicable here are rather straightforward. The factors to be considered are, quite simply, the best interests of the child and the interests of the parents. These standards were initially established by our court in *In re Application to Change Name*, 10 Kan. App. 2d 625, 628-29, 706 P.2d 480 (1985), where we held:

"[P]arents have special rights and interests with regard to their children which our courts will seek to preserve. Therefore, we hold that in exercising the discretion implicit in deciding whether a reason for a name change has been shown . . . the court considering the proposed name change for a child should also consider *the interests of the parents and the best interests of the child.*" (Emphasis added.)

The importance of determining whether a name change is in the best interests of the child was emphasized in *M.L.M. v. Millen*, 28 Kan. App. 2d 392, where we reiterated "that where a child is born to parents who are not married and the child's surname is contested, it should be decided by the trial court *on the basis of what is in the best interest of the child.*" (Emphasis added.) 28 Kan. App. 2d at 394-95. In an unpublished opinion cited by Mother, our court noted that Kansas has no presumption that the paternal surname should be used and that it is an abuse of discretion to rely on a perceived tradition as the basis for restoring the paternal surname. The court then suggested that application of the best interests test may include considerations such as:

"(1) the child's preference in light of the child's age and experience; (2) the effect of a name change on the development and preservation of the child's relationship with each parent; (3) the length of time the child has used a name; (4) the difficulties, harassment, or embarrassment a child may experience from bearing the present or proposed name; (5) the possibility that a different name may cause insecurity and lack of identity; and (6) the motive or interests of the custodial parent." *In re Marriage of Elkins*, an unpublished opinion No. 74,118 filed May 3, 1996 (citing *Hamby v. Jacobson*, 769 P.2d 273 [Utah App. 1989]).

We embrace as consistent with Kansas law the authorities cited by Mother from other jurisdictions which reject any presumption for paternal surname. These authorities note that any tradition for a child to bear its paternal surname has become inappropriate in

today's culture. There is little reason today to fear the stigma of illegitimacy; "it is doubtful that [the child's] retention of [his or] her mother's surname would even raise an eyebrow, let alone subject [him or] her to ridicule or scorn." *Lufft v. Lufft*, 188 W. Va. 339, 341, 424 S.E.2d 266 (1992); see *Collinsworth v. O'Connell*, 508 So. 2d 744, 747 (Fla. Dist. App. 1987); *Aitkin County Family Service Agency v. Girard*, 390 N.W.2d 906, 908 (Minn. App. 1986); *Gubernat v. Deremer*, 140 N.J. 120, 140, 657 A.2d 856 (1995); *Petition of Schidlmeier by Koslof*, 344 Pa. Super. 562, 569-70, 496 A.2d 1249 (1985); *In re M.C.F.*, 121 S.W.3d 891, 897 (Tex. App. 2003).

Here, Mother argues that the district court failed to make findings regarding the best interests of the child. Our examination of the record reveals that the district court paid lip service to the proper standard, but we find no actual objective consideration of the type of factors outlined in the *In re Elkins* opinion. Instead, it appears to this court that the district court either based its ruling on the perceived "game-playing" at the hospital, a misreading of our *Millen* decision, or on the mistaken notion that the father's new-found parental interest justified the paternal surname. Frankly, we believe that careful scrutiny of the district court's comments during the trial and from the bench reflect its view that children "should" have the names of their fathers, a view that is not consistent with Kansas law.

With regard to the perceived "game-playing" at birth, we disagree with the district court's view of the law and its characterization of the evidence. In stating that but for "comments made by Ms. Miller," the father's name "would have been on the birth certificate in the first place," the district court is apparently referring to the evidence that the mother invited the father to sign the birth certificate, but insisted that the child's last name be hers, which prompted the father to refuse to sign. K.S.A. 65-2409a(c) provides, in part:

"If the mother was not married either at the time of conception or of birth, or at any time between conception and birth, *the name of the father shall not be entered on the certificate of birth without the written consent of the mother* and the person

to be named as the father on a form provided by the state registrar pursuant to K.S.A. 38-1138 . . . ." (Emphasis added.)

Thus, the mother's "comments"—or as the court characterized them on the docket sheet, "game-playing"—consisted of her exercising her statutory right to refuse her consent to enter father's name on the birth certificate. The court abused its discretion by mischaracterizing the evidence based on an apparent misconception of law.

With regard to the district court's reliance on the *Millen* decision, we disagree with the district court's reading and application of the *Millen* opinion. The district court appeared to rely on the following language from *Millen*, 28 Kan. App. 2d at 395: "To construe K.S.A. 38-1130 so that one parent could unilaterally hold the other parent or a court forever hostage as to the name of a child with no recourse makes no sense, and would be a result certainly not intended by the legislature." The court's interpretation seems to be that this language requires that the child's name be changed to prevent a mother from holding a father hostage as to the name of his child. This interpretation is incorrect. The mother/appellant in *Millen* argued K.S.A. 38-1130 prevented the court from changing the name of a child without the consent of *both* parents. *Millen* rejected the mother's argument and adopted the holding of *Struble*, that a court has the authority and discretion to change a nonmarital child's name, but that the best interest of the child standard must be used in making the change. See *Millen*, 28 Kan. App. 2d at 394-95; *Struble*, 19 Kan. App. 2d at 949.

Moreover, the mother in *Millen* was affirmatively evading the father, had remarried and taken her husband's name so that the child had neither parent's surname, and the father was given primary residential custody of the child. This was clearly not the case here. Mother was granted primary residential custody of J.N.L.M., and she testified she would keep her surname in the event she married. The mother sought out the father's assistance with J.N.L.M., but the father failed to show any significant interest in raising his child until filing the parentage action. Although the father claims he had doubts whether he was J.N.L.M.'s father after

the off-hand comment by mother, he still believed the child was his as demonstrated by his claims of continued visitation and purported contributions of cash and baby supplies.

The district court here also cited as support for its decision this statement from *Millen*: "The Kansas Parentage Act is to provide that every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his or her parentage." 28 Kan. App. 2d at 395. The mother in *Millen*, however, had taken a different name, so the child in question had a different name than either unmarried parent. In this case, J.N.L.M. shares his last name with his mother, and in the event she married, he would still share his last name with his mother. Accurate identification of his parentage would therefore be achieved by either the name Miller or Killingsworth. We conclude that the court erroneously construed and applied *Millen*.

Because the district court failed to meaningfully apply the correct legal standards, relied upon an erroneous interpretation of K.S.A. 65-2409a(c) and associated testimony, misread and misapplied our court's opinion in *Millen*, failed to make findings that would facilitate meaningful appellate review of the decision (see *State v. Moncla*, 269 Kan. 61, 65, 4 P.3d 618 [2000]), and made comments on the record that may be interpreted as directly contrary to Kansas law, we conclude that there has been an abuse of discretion.

Reversed and remanded to a different district judge for further proceedings consistent with this opinion.